## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| United States ex rel. | ) | |
| Marc Osheroff | ) | Case No. 10-24486-CIV-UNGARO |
| | ) | |
| Plaintiff-Relator, | ) | |
| | ) | |
| v. | ) | Jury Trial Requested |
| Humana, Inc. | ) | |
| Humana Health Insurance | ) | |
| Company of Florida, Inc. | ) | |
| Humana Medical Plan, Inc. | ) | |
| CarePlus Health Plans, Inc. | ) | |
| CAC-Florida Medical Centers, LLC | ) | |
| Pasteur Medical Center, Inc. | ) | |
| MCCI Group Holdings, LLC | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

**You should not give gifts, meals, favors, travel or entertainment to . . . customers**. . . ."

The federal anti-kickback laws that apply to Medicare and Medicaid prohibit persons or entities from knowingly offering, paying, soliciting, or receiving remuneration of any kind to induce the referral of business under a federal program. In addition, most states have laws that prohibit kickbacks and rebates.

Also r**elated to marketing to Medicare enrollees**, **health plans are specifically prohibited from providing any kind of remuneration to entice beneficiaries to join our plans,** although the government recognizes that providing very nominal items (defined as having a retail value of $15) in the course of marketing activities is acceptable.

*Humana Principles of Business Ethics*[1] [emphasis supplied]

---

[1]

Humana Principles of Business Ethics, excerpt, pp. 15 – 19.

1

**Contents**

Introduction..............................................................................................................................4

I.   Jurisdiction and Venue.....................................................................................................8

II.  Parties.............................................................................................................................9

   A.  Plaintiffs.......................................................................................................................9

   B.  The Defendant Clinics.................................................................................................12

   C.  The Humana Defendants.............................................................................................13

   D.  All Defendants............................................................................................................14

III.  Statutory and Regulatory Programs Applicable to Defendants' FCA Violations..............15

   A.  Traditional Medicare (Parts A & B)............................................................................15

   B.  Medicare Advantage (Parts C & D)............................................................................15

   C.  Current MA Plan Enrollees are Future Prospective Enrollees .....................................17

   D.  Federal Anti-Kickback Statute....................................................................................18

   E.  The Anti-Inducement Statute .....................................................................................19

   F.  The False Claims Act..................................................................................................20

IV.  Detailed Allegations ......................................................................................................21

   A.  Routine Transportation Violates the AKS and AIS.......................................................21

      1.  Guidance on Routine Transportation.....................................................................21

      2.  Particulars of Transportation Violations.................................................................21

      3. The Transportation is Valuable and Exceeds "Nominal Value"................................23

      4.  The Transportation Offered Is Not Need Based......................................................24

      5.  Promotion of Transportation.................................................................................25

   B.  Free Meals, Massages and Salon Services are Improper Inducements..........................26

      1.  Offers of Free Meals.............................................................................................26

      2.  Offers of Free Massage and Salon Services............................................................27

      3.  Particulars of CAC's Free Meals, Massages and Salon Services.............................28

      4.  Particulars of Pasteur's Free Meals, Massages and Salon Services.........................31

      5.  Particulars of MCCI's Free Meals, Massages and Salon Services...........................35

C.  Defendants Conspired to Commit the Above Violations......................................................37

    1.  The Parties' Agreements................................................................................37

    2.  The Parties' Acts in Furtherance of their Conspiracy..............................................39

    3.  The Parties' Intent to Defraud......................................................................39

F.  Defendants Acted Knowingly............................................................................39

    1.  Humana Knows the Defendant Clinics' Conduct Is Unlawful..............................39

    2.  Humana's Express Certifications Show Knowledge of Unlawful Conduct...........41

    3.  MIPPA's Prohibitions Made Defendants' Conduct Knowingly Unlawful..............43

    4.  The Managed Care Manual Made Defendants' Conduct Knowingly Unlawful.....44

    5.  The Anti-Inducement Statute Informs Defendants of Their Unlawful Conduct....46

    6.  The OIG Informs Defendants of Their Unlawful Conduct..................................46

V.  Counts I to VII.........................................................................................47

Count I -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims Presented to Medicare
Parts B, C, and D by the Defendant Clinics...........................................................47

Count II -- 31 U.S.C. §3729(a)(1)(B):  False Statements Material to Claims Under Medicare
Parts B, C, and D by the Defendant Clinics...........................................................48

Count III -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims Presented to Medicare
Parts C and D by the  Humana Defendants..........................................................50

Count IV -- 31 U.S.C. §3729(a)(1)(B):  False Statements Material to Claims Presented to
Medicare  Parts C and D by the  Humana Defendants.................................................52

Count V -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims The Humana Defendants
Caused the Defendant Clinics to Present to Medicare Parts B, C, and D .....................54

Count VI -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims The Defendant Clinics
Caused the Humana Defendants to Present to Medicare Parts C and D  .....................54

Count VII -- 31 U.S.C. §3729(a)(1)(C):  False Claims Act Violations for Conspiracy.........55

Prayer for Relief.......................................................................................56

Exhibit List..........................................................................................57

## Introduction

1.   This *qui tam* action turns upon the common sense principle that "there's no such thing as a free lunch."[2] In other words, *someone* always pays the hidden cost of anything a business offers to the public for free.

2.   In the instant case, the hidden cost of free meals, transportation, services and entertainment offered by Miami-area medical clinics to Medicare beneficiaries are paid for by federal taxpayers.

3.   Bars draw in patrons to waste money on expensive drinks with offers of free food.  Casinos draw in customers to gamble away their money with offers of cheap food, drinks and hotel rooms.

4.   The Defendant Clinics draw in patients to fritter away Medicare funds with an entertainment atmosphere rivaling that of the casinos to which Defendants sometimes transport their patients for free.

5.   Bingo, dominoes, raffles, music, dance, salon services, massages, and luxury transportation are all part of the ongoing party by which the Defendant Clinics compete for the Medicare spending of Miami-Dade County's senior citizens.

6.   It is no accident that costs of healthcare in Miami and Dade County are the highest in the nation. Supposedly "free" services and entertainment of the sort offered by the Defendant Clinics, but for all practical purposes provided nowhere else in the country,[3] not even in Broward county by these Defendants, add to the exorbitant healthcare tab picked up by the Medicare program in Miami.

---

[2]      This was the title of a 1975 book by Nobel-prize-winning economist Milton Friedman. The expression has its origin in the practice of 19th Century bars of offering "free lunch" as a way to entice patrons to spend their money on drinks that paid for the cost of the food and generated a profit for the saloon keeper.  *See generally* http://en.wikipedia.org/wiki/There_ain't_no_such_thing_as_a_free_lunch (last visited November 22, 2011).

[3]      The exception may be New York's immigrant neighborhoods, but healthcare costs in New York are second only to Miami's.

7.    There is also another dangerous factor at play in the provision of free services and entertainment to Medicare beneficiaries in Miami -- the principle of reciprocal altruism, which drives up healthcare utilization rates.

8.    Human nature dictates that recipients of gifts and entertainment feel obligated to reciprocate.[4] This is the principle at play when a recipient of a "gift" feels obligated to reciprocate.

9.    Simply put, most people do not want to feel that they are taking advantage of the generosity of others. Therefore, elderly patients who receive free food, services and entertainment at the Defendant Clinics feel obligated to order expensive medical services whether they really need them or not, driving up healthcare utilization rates.[5]

10.    Another problem created by the offering of free services and entertainment at the Defendant Clinics is that other providers who cannot offer such inducements for legal, ethical or financial reasons, are placed at a distinct competitive disadvantage against the Defendant Clinics.[6]

---

[4]    Research shows that even highly compensated professionals such as physicians are influenced by very small gifts. *See* The Scientific Basis of Influence and Reciprocity: a Symposium (Amer. Ass'n Medical Colleges, 2007).  "One [physician] asked indignantly, 'you don't really think that I would let a pizza lunch influence my decision making process for my patients, do you?' " The answer is a resounding and consistent: YES.  *Id.*  The symposium reviewed the growing body of neurobiological and psychosocial evidence related to the effects of gifts on recipients' [doctors'] choices and decisions. It addressed the biasing effects of influence and reciprocity on decision-making and found "remarkable" consistency of findings from several scientific approaches.  *Id, at p.2.*

[5]    Few judges would tolerate a party's offer of *unlimited* free lunches, manicures, pedicures and monthly massages to a clerk or judicial assistant. Such gifts or favors might subconsciously bias the assistant in favor of the party or create a sense of obligation. Similarly, the Medicare program does not want persons who are ordering medical services at the government's expense, whether they are doctors or patients, to feel obligated to order services as the result of gifts or favors.

[6]        This was recognized in comments to safe harbor regs:

        [T]he law does not make increased cost to the government the sole criterion of corruption. In prohibiting 'kickbacks,' Congress need not have spelled out the obvious truisms that, while unnecessary expenditure of money earned and contributed by taxpaying fellow citizens may exacerbate the result of the crime, kickback schemes can freeze competing suppliers from the system, can mask the possibility of government price reductions, can misdirect program funds, and, when proportional, can erect strong temptations to order more drugs and supplies than needed."
    http://oig.hhs.gov/fraud/docs/safeharborregulations/072991.htm

11. For these reasons, the federal Anti-Kickback Statute , 42 U.S.C. § 1320a-7b, makes it a crime for healthcare providers even to *offer* remuneration, whether in cash or in kind, to any person to purchase or order healthcare services paid for by a federal healthcare program:

> **(b) Illegal remunerations**
>
> * * * * *
>
> **(2)** whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person . . . .
>
> **(B)** to purchase . . . [or] order . . . any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, shall be guilty of a felony and upon conviction thereof, shall be fined not more than $25,000 or imprisoned for not more than five years, or both.

12. By well-settled authority, "remuneration" prohibited by the Anti-Kickback Statute includes "valuable gifts that are intended to induce patients to order services paid for in whole or in part by a Federal health care program." HHS OIG Advisory Opinion No. 00-7.

13. The Anti-Inducement Act, 42 U.S.C.§ 1320a-7a, also imposes civil monetary penalties upon any person who "offers to or transfers remuneration to any individual eligible for benefits under [Medicare] that such person knows or should know is likely to influence such individual to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made, in whole or in part, under [Medicare]."

14. The Anti-Inducement Statute defines "remuneration" as including "transfers of items or services for free or for other than fair market value." 42 U.S.C. § 1320a-7a (i) (6).

15. The Defendant Clinics have violated the Anti-Kickback Statute and the Anti-Inducement Statute by routinely offering free lunches, limo rides, beauty care, massages, and other services and entertainment of more than nominal value to patients to induce them to patronize the clinics at the expense of federal healthcare programs.

16. The clinics go far beyond the provision of gifts of nominal value, marketing themselves as social centers to which senior and underprivileged patients are chauffeured in free limousine-class vehicles to enjoy free meals, take-away food, personal pampering, bingo, dominoes, raffles,

music and dance as part of an expense-free social or entertainment outing of great cost to the clinics and significant value to their patrons.

17.   All of the Defendant Clinics have executed Medicare Enrollment Applications acknowledging that they "understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal Anti-kickback statute . . .), and on the supplier's compliance with all applicable conditions of participation in Medicare."

18.   Violations of the Anti-Kickback Statute and the Anti-Inducement Statute can form the basis for violations of the False Claims Act. Congress specifically amended the Anti-Kickback Statute on March 23, 2010, to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759 codified at 42 U.S.C. § 1320a-7b(g).

19.   By knowingly submitting tainted fee-for-service claims to Medicare Parts B, C and D in violation of the Anti-Kickback Statute and the Anti-Inducement Statute, the Defendant Clinics are liable for submission of false claims in violation of the False Claims Act.  *See McNutt v. Haleyville Medical Supplies, Inc.*, 423 F. 3d 1256 (11th Cir. 2005).

20.   By knowingly utilizing inducements to enroll patients in the Humana Defendants' Medicare Advantage plans and knowingly submitting tainted fee-for-service claims to the Humana Defendants for payment under such plans, the Defendant Clinics have caused the Humana Defendants to submit tainted capitation claims and cost data to Medicare Parts C and D in violation of the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act. *See U.S. ex rel Wilkins v. United Health Group*, 659 F.3d 295 (3rd Cir. 2011) and *U.S. ex rel Hutcheson v. Blackstone Medical, Inc*., 647 F.3d 377 (1st Cir. 2011).

21.   The Humana Defendants' Medicare Advantage Contracts also make compliance with the Anti-Kickback Statute and the Anti-Inducement Statute a pre-condition to payment under Medicare Parts C & D.  The contracts state specifically, that "The MA Organization agrees to comply with . . . [f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to . . . the anti-kickback statute . . . ."

22.   The Humana Defendants are liable for knowingly presenting tainted capitation claims and cost data to Medicare Parts C & D for patients enrolled in their Medicare Advantage plans in violation of the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act and for causing the Defendant Clinics to submit tainted fee-for-service claims to Medicare Parts B, C and D.

23.   All Defendants are liable for conspiring to violate the Anti-Kickback Statute, the Anti-Inducement Statute and the False Claims Act.

## I.  Jurisdiction and Venue

24.   This civil action arises under the Federal False Claims Act, 31 U.S.C. § 3729 *et seq*.

25.   Jurisdiction over this action is vested in this Court by 31 U.S.C. § 3732, which specifically confers jurisdiction on this Court for actions brought pursuant to 31 U.S.C. § 3729 and § 3730; pursuant to 28 U.S.C. § 1331, which confers federal subject matter jurisdiction; and pursuant to 28 U.S.C. § 1345 because the United States is a plaintiff.

26.   This Court has personal jurisdiction over Defendants under 31 U.S.C. § 3732(a) because one or more Defendants can be found, resides, or transacts business in this District, and because acts proscribed by 31 U.S.C. §3729 occurred in this District. One or more Defendants have also made, used, or caused to be made or used, false or fraudulent records in this District to get false or fraudulent claims paid or approved by the Government. Venue is proper in this district under 31 U.S.C. § 3732(a) and 28 U.S.C. § 1391.

27.   The facts and circumstances which give rise to Defendants' violations of the False Claims Act have not been publicly disclosed in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party; in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; nor from the news media.

28.   Relator brings this action based on his direct knowledge and also on information and belief. Relator's allegation are independent of and materially add to any publicly disclosed allegations or transactions, thus to the extent there has been a public disclosure, Relator is an "original source" as that phrase is used in the False Claims Act, 31 U.S.C. § 3730(e)(4).

29.   Relator voluntarily provided to the Attorney General of the United States, pursuant to a joint prosecutorial and common interest privilege statement, a summary of known material

8

evidence and information related to the Complaint, in accordance with the provisions of 31 U.S.C. § 3730(b)(2).

## II.  Parties

### A.  Plaintiffs

30.    Plaintiff, the United States of America (hereinafter "the Government"), funds the provision of medical care to senior citizens through the Medicare program.

31.    Plaintiff-Relator Marc Osheroff ("Relator"), here sues for himself and on behalf of the United States and the State of Florida, to recover damages and civil penalties arising from Defendants' actions in violating the Federal False Claims Act, 31 U.S.C. § 3729 *et seq.*

32.    Relator is an individual resident of Broward County, Florida, who works in Miami-Dade and Broward counties, and has direct and personal knowledge of the allegations herein.

33.    Relator is a successful entrepreneur who founded and operated successful businesses in varied fields including electronics, motorcycles, commercial real estate, medical office buildings, parking facilities, warehouses, and others. He has enjoyed success in retail sales, as a wholesaler, and as a business and real estate investor.

34.    Since Relator's money is at risk in his businesses, it is his practice to approach any investment in a new business by first performing "market research" to ensure a businesses' viability.

35.    Although Relator has no academic degrees beyond high school and has completed no business courses or marketing courses he has been very successful as a result, in part, of his ability to perform market research.

36.    Since he has no formal marketing education his marketing research is informal. He speaks to many people and asks many questions. This approach helps him decide which investments to make, which to avoid, when to buy and when to sell.

37.    Since 1993 Relator has had physician tenants in his buildings and has known that medical clinics are very profitable.

38.    In 1996 Relator founded The Centre of Cosmetic Surgery with a physician partner. Relator and his partner contemplated expanding that clinic to include a more general clinic and around 1999 Relator began negotiations to purchase or merge with the Florida Center of Cosmetic Surgery.

39.   In 2000 Relator began to operate his first medical office building and continued to research medical clinics and the marketing of medical clinics.

40.   During the early 2000s Relator continued to research opportunities to found clinics and to purchase and operate medical office buildings.

41.   Around the same time period, along with a physician partner, Relator began to investigate opening an outpatient surgery and rehabilitation center in the medical office building he owned on the campus of the hospital that is now called Jackson North Medical Center ("Jackson North").

42.   As the business partner, it was Relator's job to evaluate the Center's market potential. Relator researched marketing the businesses, which involved not just the marketing of outpatient surgery and rehabilitation but research to develop an understanding of the competition for patients by clinics such as those operated by the Defendant clinics.

43.   Relator's research showed that the competition for patients faced barriers created by the Defendant Clinics and others, who compete for patients using unlawful inducements. Once these clinics "owned" the patients by virtue of continued inducements, the patients were removed from the market. Eventually Relator decided to drop this business idea due to these marketing challenges, along with difficulties dealing with Jackson Health System.

44.   Around 2006, along with a physician partner, Relator began to develop plans for an MRI (magnetic resonance imaging) clinic since he had already expended money for the build-out of an office including high amperage electricity, extra air conditioning for the MRI hardware, and copper lining in the walls. Relator and his partner also acquired MRI hardware. As the business person for the MRI clinic, it was Relator's job to evaluate the market potential. Again, Relator researched marketing medical businesses, which involved not just the marketing of an MRI clinic, but an understanding of the competition for patients with other businesses, such as those run by the Defendant Clinics.

45.   Relator found that the Defendant Clinics (and others) compete for patients using unlawful inducements. Once the Defendant Clinics "owned" the patients by virtue of continued inducements, those patients were removed from the market. The Defendant Clinics could then choose whether to install their own MRI hardware or negotiate a much less profitable

arrangement with an office such as Relator's. That was one of the reasons Relator did not pursue the business of an MRI clinic.

46.     In mid-2007 Relator learned that Dr. Leon sold *part* of his Leon Clinic's Hialeah-based business for $355 million, which further stimulated Relator's interest in the clinic business.

47.     From the early 2000s to the present Relator continued his interest in owning and operating a clinic. In researching what would influence people to utilize a clinic, Relator spoke with many people and asked many questions. The people Relator spoke with include:

- Physician tenants in Relator's medical office buildings, many of whom accept patients from large clinics, and many of whom compete with clinics;

- Relator's tenants' employees who hear about healthcare marketing practices in Miami-Dade County, both directly and through their patients, and especially the older employees;

- Elderly and other visitors to the shopping mall Relator owns attached to Palmetto hospital;

- Elderly and other visitors in the medical office buildings Relator owns and operates in Miami-Dade County;

- Relator's employees;

- Patrons of Pasteur's *Club de Abuelos*;

- Workers such as servers, bellhops, laborers in the communities where Relator owns and operates his businesses, including elderly workers;

- Miami-Dade business owners, who are familiar with the healthcare needs of their employees and those employees' parents and grandparents and how to meet those needs.

48.     From this market research over many years, Relator learned that the clinics in Miami-Dade County (where Relator owns and operates medical office buildings), including those run by the Defendant Clinics, offer and provide inducements to potential customers such as free meals; free cell phones; beauty salon services, including free manicures, free pedicures, and free massages; entertainment, including bingo, dominoes, raffles, music, dances and parties; and free transportation from customers' homes to the clinics, shopping malls (such as where Pasteur has its *Club de Abuelos*) and even to casinos. Relator learned this happens with nearly all Hialeah-

area clinics and especially with those run by the Defendant Clinics.  Relator also learned that the Government prohibits kickbacks and inducements to get federal healthcare business.

49.   More recently, Relator observed the Defendant Clinics' vehicles clogging his driveway to his medical office building and his shopping mall at Palmetto Hospital where they typically carry two or fewer passengers. Not only did they block circulation of his tenants' customers and patients, they reduced parking revenue at his Palmetto Hospital garage.

50.   It became clear to Relator that the community's largest and most "successful" clinics, such as those owned and operated by the Defendant Clinics, have become so by offering non-health related gifts and entertainment as inducements to potential customers.

51.   It became clear to Relator that offers of free meals, free transportation and other benefits that are not primarily health related would and do influence Medicare beneficiaries to change providers and Medicare Advantage plans or to keep the providers and plans they have.

52.   Relator's conclusion concerning healthcare clinics was that although they are very, very profitable, their profitability is based in large part on the Defendant Clinics' willingness to violate the Anti-Kickback Statute and the Anti-Inducement Statute so as to induce Medicare beneficiaries to use their clinics, to enroll in the Humana Defendants' Medicare Advantage plans and to stay enrolled in those plans.

53.   Relator continues to be interested in owning and operating clinics, especially in Miami-Dade where he owns and operates medical office buildings.

### B.  The Defendant Clinics

54.   **Pasteur Medical Center, Inc.,** ["Pasteur"], is a Florida corporation with medical clinics in the Miami-Dade County market.

55.   **MCCI Group Holdings, LLC,** ["MCCI"], is a Delaware corporation with medical clinics in the Miami-Dade County market.

56.   **CAC-Florida Medical Centers, LLC** ["**CAC**"], is a Florida subsidiary of Humana Inc. with medical clinics in the Miami-Dade County market.

57.   Pasteur, MCCI and CAC are collectively referred to herein as the **Defendant Clinics**.

58.   On information and belief, the Defendant Clinics provide medical services, supplies, prescription drugs and other services and supplies to patients with a variety of commercial and

12

governmental healthcare benefits, but focus their business upon patients with Medicare and Medicaid benefits.

59.   The Defendant Clinics have executed Medicare Enrollment Applications in the form attached as Exhibits F pursuant to which they bill a fiscal intermediary of the Centers for Medicare and Medicaid Services ("CMS") charges under Medicare Part B on a fee-for-service basis.

60.   On information and belief, the Defendant Clinics have also entered into Independent Practice Association Participation Agreements similar to the example attached as Exhibit D2 (Humana – MCCI Contract) pursuant to which they bill the Humana Defendants charges for services, supplies, prescription drugs and other charges on a fee-for-service basis under Medicare Parts C and D.

### C.  The Humana Defendants

61.   Defendant **Humana Inc., ("Humana")**, is a Delaware corporation headquartered in Louisville, Kentucky.  It is one of the nation's largest publicly-traded health and supplemental benefits companies and generated revenue of approximately $31 billion for the year ended December 31, 2009.

62.    CMS has entered into Medicare Advantage Organization contracts with various Humana subsidiaries pursuant to which Humana provides Medicare Part C and D benefits to 1.5 million Medicare Advantage (MA) members nationwide.

63.   **Humana Health Insurance Company of Florida, Inc.**  (a Florida insurance company), is a Florida subsidiary of Humana Inc.

64.   **Humana Medical Plan, Inc.** (a Florida health maintenance organization) is a Florida subsidiary of Humana Inc.

65.   **CarePlus Health Plans, Inc.** is a Florida subsidiary of Humana, Inc. Careplus states in its ads it "specializes in Medicare plans – and only Medicare."[7]

66.   With respect to the Humana Defendants, this Complaint concerns only Miami-Dade County beneficiaries under Medicare Parts C and D, many of whom are provided benefits under

---

[7]     "More than 67,000 Floridians have entrusted us with their healthcare.  … This makes us proud because we are a Florida born and based *company that specializes in Medicare plans – and only Medicare.*" [emphasis supplied]. CarePlus Health Plans, Inc., Miami Herald advertisement page 16 a, Tuesday, September 27, 2011, Medicare approved ad, H1019_MKN95G.

Humana plans H1036 and H1019, among others, all of which are offered by various Humana subsidiaries, including **Humana Medical Plan, Inc.** and **CarePlus Health Plans, Inc.** Approximately 36,000 Miami-Dade County residents are provided Medicare Part C and D benefits under Humana plan H1036 and approximately 34,000 under Humana plan H1019.

67.    Humana and its subsidiaries offering Medicare Advantage plans in the Miami-Dade County market are herein collectively referred to as the "**Humana Defendants**."

68.    As of December 31, 2009, the Humana Defendants were filing monthly claims with the United States for approximately 377,900 Florida-based MA beneficiaries.

69.    In 2009, Humana submitted claims for and the government paid approximately $5.2 billion ($5,200,000,000) on behalf of Florida-based MA beneficiaries.

70.    On information and belief, Relator estimates Humana submitted claims for and the government paid approximately one billion dollars for the over 72,000 Miami-Dade county-based MA beneficiaries.

71.    As required by the Government, all claims are filed electronically.

### D.  All Defendants

72.    At all times relevant hereto, Defendants acted through their agents and employees and the acts of Defendants' agents and employees were within the scope of their agency and employment. The offers and practices alleged in this complaint were, on information and belief, set or ratified at the highest corporate levels of Defendants.

73.    The Defendant Clinics act as a feeder system for enrollment of Medicare patients in the Medicare Advantage plans offered by the Humana Defendants.  Humana prominently displays its name and logo on the exterior of the clinic buildings alongside the names of the Defendant Clinics.  An example of the signage is shown on Exhibit G.

74.    Humana marketers distribute materials on the premises of the Defendant Clinics and Humana contributes to costs of transportation, meals and other inducements offered by the Defendant Clinics.

75.    The Defendant Clinics serve some Medicare beneficiaries under traditional Medicare Part B and use free food, transportation and other inducements to lure additional Medicare Part B beneficiaries away from competing providers.

76.   For beneficiaries enrolled in traditional Medicare Part B, the Defendant Clinics bill Medicare on a fee-for service basis.  For beneficiaries enrolled in the Humana Defendants' Medicare Advantage plans, the Defendant Clinics bill the Humana Defendants on a fee-for-service basis, but also share in Humana's profit or loss.

77.   If the annual cost of medical care for the clinic's Medicare Advantage patients is less than the capitation payments received by Humana from Medicare Parts C and D, the clinics share in the profit.  If the annual cost of medical care for the clinic's Medicare Advantage patients is more than the capitation payments received by Humana, the clinics share in the loss.

78.    The Defendant Clinics therefore have an incentive to convert potentially profitable Medicare Part B patients into members of the Humana Defendant's Medicare Advantage plans.

### III.  Statutory and Regulatory Programs Applicable to Defendants' FCA Violations

#### A.  Traditional Medicare (Parts A & B)

79.   Medicare is a federally funded health insurance program primarily benefiting the elderly. 42 U.S.C. § 1395 *et seq.*

80.   The United States Department of Health and Human Services (HHS), through its component CMS, administers the Medicare program.

81.   Medicare Part A is hospital insurance that covers the cost of inpatient hospital services and post-hospital nursing facility care. Provider charges under Medicare Part A are paid under a Prospective Payment System that provides a flat-rate payment based upon a patient's admitting diagnostic code, with certain adjustments for outlier cases that greatly exceed average costs of treating patients with the same diagnosis.

82.   Medicare Part B is medical insurance that covers the cost of physician services and outpatient care.  Provider charges under Medicare Part B are paid on a fee-for-service basis at rates established by Medicare.

#### B.  Medicare Advantage (Parts C & D)

83.   Medicare Advantage ("MA") Plans (originally known as "Medicare+Choice Plans"), enacted at Medicare Part C, Social Security Act §1851 [42 U.S.C. § 1395w–21] through § 1859 [42 U.S.C. § 1395w–28] allow individuals to opt out of fee-for-service plans under Medicare Parts A and B and enroll in a privately run managed care plan.

15

84.   MA Plans are designed to provide all Medicare Part A and Part B benefits, plus additional *health-related* services, including subsidized prescription drug benefits under Medicare Part D for organizations electing to offer that benefit.  The MA plans offered by the Humana Defendants in the Miami-Dade County market elect to provide the prescription-drug benefit.

85.   An MA plan provides health benefits coverage under a policy or contract offered by a Medicare Advantage organization under which a specific set of health benefits are offered at a uniform premium and uniform level of cost-sharing to all Medicare beneficiaries residing in the service area of the MA plan who elect to join the plan.

86.   Unlike medical providers under Medicare Parts A and B, who submit claims on CMS forms 1450 and 1500 or their electronic equivalents, MA plans do not file invoice-type "claims" with CMS. Rather, MA plans, regulated under Medicare Part C, participate in a lengthy *payment process* in which MA plans, and MA plans' contractors and subcontractors all provide data to the government. Based on this data, an actuarial determination of annually re-determined capitation rates is calculated. 42 C.F.R. §422.308. The annual capitation rate is then paid to Medicare part C providers on a monthly basis. §422.306.

87.   As a condition to receipt of its monthly payment, the organization's chief executive officer (CEO), or an individual delegated with the authority to sign on behalf of the CEO, must make a monthly certification, based on best knowledge, information, and belief, that the risk adjustment data submitted to CMS are accurate, complete, and truthful. 42 C.F.R. § 422.502.

88.   The monthly certification requests payment as follows:

> "Pursuant to the contracts between the Centers for Medicare and Medicaid Services (CMS), and CarePlus Health Plans, Inc. (hereafter referred to as the "Organization") governing the operation of the following contract: H1019, the Organization hereby requests payment under the contract and in doing so makes the following certifications concerning CMS payments to the organization . . . ." [Emphasis supplied]

89.   For example, David Jarboe signing as "CEO" of the Humana subsidiary CarePlus Health Plans Inc. *requested payment* on the following dates:

> 2009:  January 5, February 3, March 11, April 12, May 15, June 16, July 8, August 13, September 9, October 15, November 12, December 3.

> 2010:  January 6, February 4, March 7, April 2, May 4, June 7, July 2, August 6, September 3, October 8, November 5, December 6.

2011:  January 6, February 4, March 9, April 4, May 6, June 6, July 1, August 5, and on information and belief in the months since then.

90.   The January 6, 2011 certification is attached as Exhibit E1.  The other certifications, but for the dates, are substantially identical and all the certifications state that they "request payment" under the contract.

91.   Mr. Jarboe, in addition to being the CEO of CarePlus Health Plans, Inc., is also the CEO of Defendant CAC, one of the Defendant Clinics.

### C.  Current MA Plan Enrollees are Future Prospective Enrollees

92.   Current enrollees in Medicare Advantage Plans are potential enrollees for the following plan year.[8]

93.   For example, CMS defines "Promotional Activities," in relevant part, as "Activities performed by a plan, or by an individual or organization on a plan's behalf, to inform *current and potential enrollees* of the products available."  CMS Pub. 100-16 Medicare Managed Care, Chapter 3 Introduction 20 –  Definitions.

94.   Nothing in the statute or regulations suggests a *current* enrollee with respect to one year's plan is not also a *prospective* or *potential* enrollee with respect to the following year's plan.

95.   Under MIPPA, the persons to whom meals may not be provided include "prospective enrollees," 42 U.S.C. § 1395w–21 (j)(1)(C), and "potential enrollees", 42 C.F.R. § 422.2268(p).

96.   MA Marketing Guidelines (CMS Pub. 100-16 Medicare Managed Care, Chapter 3) cover current enrollees who are viewed as potential enrollees.

97.   *Marketing* guidance for *current* enrollees is also extensively covered in the Medicare Marketing Manual, including definitions of "Post-Enrollment Marketing Materials," "Ad-hoc Enrollee Communications Materials" (which includes communications to current enrollees) and marketing guidance throughout the chapter.

---

[8]      Medicare regulations define the terms "enrollee," "plan enrollee," and "eligible individual":

*"Enrollee* means an MA eligible individual who has elected an MA plan offered by an MA organization." 42 C.F.R. § 422.561  Definitions.

"*MA eligible individual* means an individual who meets the requirements of Sec. 422.50." 42 C.F.R. § 422.2  Definitions.

*"MA plan enrollee"* is an MA eligible individual who has elected an MA plan offered by an MA organization." 42 C.F.R. § 422.2  Definitions.

98.    Other provisions in the Medicare Marketing Manual which govern marketing to current enrollees, and thereby view current enrollees as potential enrollees, include definitions of Ad-hoc Enrollee Communications Materials; 30.16, Plan Ratings Information, 40.11; 40.14.1 ("marketing materials sent to current members..."); 50.11; 60.4.2; 60.5.2; 60.7; 70.5; 70.5.1; 70.8 ("Marketing to current plan members of non-MA plan covered health care products, and/or non-health care products, is subject to HIPAA rules."); 70.11; 80.1; 80.1.3; 90.2.2; 90.10; 170.1; 170.2.

99.    Consequently, under the prevailing rules and regulations, a current enrollee is a prospective enrollee.

100.    Neither a current enrollee nor a prospective enrollee may be offered remuneration over a nominal amount as an inducement to enroll in a Medicare Advantage plan.

### D.  Federal Anti-Kickback Statute

101.    The Federal Anti-Kickback Statute (the "AKS"), Social Security Act 1128(B)(b), codified at 42 U.S.C. § 1320a-7b(b), establishes criminal penalties for:

> (b) Illegal remunerations
>        ...
>        (2) Whoever knowingly and willfully offers or pays any remuneration (including any kickback, bribe, or rebate) directly or indirectly, overtly or covertly, in cash or in kind to any person to induce such person—
>            ...
>            (B) to purchase, lease, order, or arrange for or recommend purchasing, leasing, or ordering any good, facility, service, or item for which payment may be made in whole or in part under a Federal health care program, ...

102.    Under this statute, health care providers may not even *offer* any remuneration, directly or indirectly, overtly or covertly, that is intended to induce the purchase, order or recommendation of any service or item that may be paid for, in whole or part, by a Federal health care program. 42 U.S.C. § 1320a-7b(b).

103.    The AKS is violated if one purpose of an arrangement is to induce referrals, even if other, legitimate purposes are also present.

104.    The provision of free goods or services to Medicare beneficiaries who have an ongoing relationship with a provider is likely to influence those beneficiaries to make future purchases or choose to remain with that provider.

105. Compliance with the AKS is a material condition of payment under the Medicare program. 42 U.S.C. § 1320a-7b(g).

106. A claim that includes items or services resulting from a violation of the AKS constitutes a false or fraudulent claim for purposes of the FCA. 42 U.S.C. § 1320a-7b(g).

107. The "knowingly and willfully" standard of § 1320a-7b(b)(2) is met if Defendants knew their conduct was generally unlawful, regardless of whether they knew they were violating the AKS.

108. The knowing submission of a claim based on a referral precluded by the AKS constitutes a violation of the False Claims Act.

109. A provider who uses inducements such as free transportation, free beauty salon services, free manicures, free pedicures, free massages, and free meals has a competitive edge over other medical service providers and, thus, hurts the entire Medicare system by inducing individuals to make medical care choices based on factors extraneous to the provision of the best medical care and may further result in causing medical care providers who follow the laws and provide good services to fail.

### E. The Anti-Inducement Statute

110. The Anti-Inducement Statute, § 1128A(a)(5) of the Social Security Act [42 U.S.C. § 1320a–7a], authorizes the imposition of civil monetary penalties against health care providers that *offer* to or transfer remuneration to Medicare and Medicaid beneficiaries in order to influence their selection of a particular provider.

111. The Anti-Inducement Statute defines "remuneration" to include transfers of items or services for free or for other than fair market value that a provider *knows or should know* is likely to influence such individual to order or to receive any item or service from a particular provider. 42 U.S.C. §1320a-7a(a)(5). *See also* 42 C.F.R. § 1003.102(b)(13).

112. Free meals, haircuts, manicures, massages, transportation and entertainment of more than nominal value fall within the ambit of the Federal Anti-Inducement Statute.

113. The "should know" standard is met if a provider acts with deliberate ignorance or reckless disregard. No proof of specific intent is required. *See* 42 C.F.R. § 1003.101.

114.    The OIG's Special Advisory Bulletin "Offering Gifts and Other Inducements to Beneficiaries," August 2002, put all MA providers on notice of the risks of providing valuable gifts and transportation.

115.    The Defendant Clinics affirmatively acknowledged this prohibition by signing documents that were filed with the government.

116.    Defendant Humana's Principles of Business Ethics state:

> Health plans are specifically prohibited from providing any kind of remuneration to entice beneficiaries to join our plans, although the government recognizes that providing very nominal items (defined as having a retail value of $15) in the course of marketing activities is acceptable.

117.    Humana instructs its employees in its Principles of Business Ethics "You should not give gifts, meals, favors, travel or entertainment to . . . customers.  . . ."

118.    The Defendant Clinics, with the Humana Defendants' knowledge and consent, provide free transportation, meals, massages, beauty salon services and other gifts and entertainment to current enrollees and free meals to current and prospective enrollees in violation of the Anti-Inducement Statute.

### F.  The False Claims Act

119.    Under the Federal False Claims Act (FCA), 31 U.S.C. §3729(a) *et seq*., any person having direct, personal knowledge about a violation of the Act may bring an action on behalf of the United States of America.

120.    A provider's failure to inform itself of the legal requirements for participation in the Medicare program acts in reckless disregard or deliberate ignorance of those requirements, either of which is sufficient to charge it with knowledge of the falsity of the claims under the FCA.

121.    Violations of the Anti-Kickback Statute and the Anti-Inducement Statute can form the basis for violations of the False Claims Act.  Congress specifically amended the Anti-Kickback Statute on March 23, 2010, to clarify that "a claim that includes items or services resulting from a violation of this section constitutes a false or fraudulent claim for purposes of [the FCA]." Patient Protection and Affordable Care Act of 2010 ("PPACA"), Pub. L. No. 111-148 § 6402(f), 124 Stat. 119, 759 codified at *42 U.S.C. § 1320a-7b(g).*

122.    Defendants violated the FCA in the particulars set forth below in Counts I through VII of this complaint.

20

### IV.  Detailed Allegations

#### A.  Routine Transportation Violates the AKS and AIS

##### 1.  Guidance on Routine Transportation

123.   Free transportation services may implicate the criminal anti-kickback statute which prohibits offering anything of value to any "person" (including a federal healthcare beneficiary) to reward or induce referrals (including self referrals) for items or services reimbursable under any Federal health care program. OIG Advisory Opinion No. 07-02, issued March 7, 2007.

124.   The OIG has determined that free transportation could generate prohibited remuneration under the Anti-Kickback Statute because it is likely to influence the initial or *subsequent* choice to obtain services and was likely to influence Medicare beneficiaries to choose one supplier over another. OIG Advisory Opinion No. 07-02, Issued March 7, 2007.

125.   The Anti-Kickback Statute prohibits offers of free transportation services if one purpose of the offer is to induce self-referrals.

126.   Transportation benefits, other than medical transportation, are expressly prohibited.

127.   One reason Defendants offer free transportation service is to induce self-referrals.

##### 2.  Particulars of Transportation Violations

128.   In August 2007, Relator became especially aware of the transportation provided by Defendants since he was then evaluating the purchase of a medical office building and large garage at Palmetto Hospital in Hialeah (Miami-Dade County), Florida.

129.   Following the purchases of the building and the garage, Relator, as the garage operator, became increasingly aware of the frequency of free transportation stopping at his facility because it erodes garage revenue.

130.   In early 2010, Relator studied the Defendant Clinics' and others' free transportation to his facility and found that nearly all trips by the Defendant Clinics' limo-class vehicles contained two or fewer passengers even though the vehicles seat 8, 10 or more.

| Entity | Total Trips | 2 or fewer passengers | 3 or more passengers |
|--------|-------------|------------------------|----------------------|
| CAC | 93 | 88 | 5 |
| Pasteur | 141 | 129 | 12 |
| MCCI | 104 | 99 | 5 |

21

131.   Relator made inquiries and ad hoc observations of Defendants' vehicles going to Defendants' facilities and saw that most of the vehicles appeared to contain two or fewer passengers and he never saw a vehicle that appeared full.

132.   The *only* report of a full bus was when Pasteur took enrollees to the casino.

133.   All Defendants are aware of and approve of the provision of free transportation.

134.   The availability of unlimited free non-medical transportation was confirmed by the following:

- CAC Westchester Medical Center, 2350 SW 84th Ave., Miami FL, 33155, on October 12, 2010, confirmed by Janet Ortiz, the CarePlus "agent.

- CAC Westland Medical Center, 975 W 49th Street, Hialeah, confirmed by employee Maddie LNU.

- CAC 18623 S. Dixie Highway on November 9, 2010, confirmed by Antonio de Rose, benefits representative.

- CAC 10401 SW 40 St. Miami, on November 11 2010, confirmed by Jose Losadas, benefits representative.

- CAC 8686 Coral Way, Miami, on November 8 2010, confirmed by Gloria LNU.

- Pasteur, 5900 Northwest 183 St., Miami Gardens, confirmed by Laura, LNU.

- Pasteur, 4578 West 12th Avenue, Hialeah, Florida, Director of Transportation, Al Lozano. Mr. Lozano said that seniors go on different outings with free transportation provided by Pasteur to malls, Wal-Mart and, until recently, to the Seminole Indian Village for gambling. However, they have not been going to the Indian Village for the past few months. He said they used to go twice a month.

- Pasteur, 9700 SW 24 St. Miami, Florida, confirmed by Madeline LNU.

- Pasteur Medical Center, 19177 S. Dixie Highway, Miami, Florida, confirmed by Tatiana Ambruster, "customer service" employee. Ms. Ambruster explained the offer included daily transportation to the medical center for non-medical purposes to members who live as far away as the Florida Keys.

- Pasteur Medical Center, 1247 W 44 Place, Hialeah, Florida, 33012 217 provides transportation to places such as Wal-Mart and other field trips.

135.   On information and belief, the Defendant Clinics fail to disclose to the Government that their transportation services are offered:

- without regard to medical necessity,
- without regard to whether the beneficiaries have medical appointments (i.e. the Defendant Clinics provide free transportation for free lunch and other social and entertainment activities).
- in a manner that exceeds "nominal value,"
- without regard to availability of free public transportation and other alternative means of transportation,
- with little regard to location of pick-up or destination.

### *3. The Transportation is Valuable and Exceeds "Nominal Value"*

136.   The transportation *offered* exceeds "nominal value" for all patients, potential patients, enrollees and potential enrollees.

137.   The transportation *provided* exceeds "nominal value" for patients, potential patients, enrollees and potential enrollees who make use of it.

138.   A portal-to-portal round-trip Miami-Dade county cab fare exceeds $10 for all trips exceeding one (1) mile and exceeds $15 for all trip exceeding 1.85 miles.

139.   A Miami-Dade county cab three-mile fare (assuming no additional $.40 per minute charge for wait time) is $9.30 ($10.70 with a 15% tip), a round trip fare of approximately $20.

140.   In contrast to typical Miami-Dade taxicabs, which would likely cost passengers going to Defendants' medical facilities in excess of the minimum allowed by law, Defendants provide transportation and limo-level service in vehicles that are often as well-appointed and as comfortable as typical Miami-Dade limousines.

141.   In 2006, the legal minimum rate for a limousine ride in Miami-Dade County was $80.

142.   Limousine companies that provide standup walk around vehicles similar to those provided by Defendants charge approximately $125 per hour or more, (before tax and tip), with a two or more hour minimum.

143.   All the Defendant Clinics offer free transportation in which passengers can stand and walk.

144.    Although Pasteur's websites show photos of a passenger sedan, the vehicles are actually large vehicles in which passengers can stand and walk.

145.    The free transportation is in all actuality a *de facto* private limousine service.

### *4.  The Transportation Offered Is Not Need Based*

146.    The Defendant Clinics make available free transportation services to their patients and enrollees without individualized determinations of need.

147.    Defendants offer (and provide) free transportation to their medical and recreational facilities even if there is no medical purpose for the visit and the visits do not coincide with medical appointments.

148.    Defendants' free transportation is provided to all patients, regardless of whether they have other regular and reliable means of transportation.

149.    There exists abundant and economical public transportation in Miami-Dade County.

150.    Public transportation in Miami-Dade County is *free* with a "Golden Passport" which is available upon proof of residency and age to all Miami-Dade residents age 65 and older, and Social Security beneficiaries.

151.    CAC knows that free public transportation is available since it arranges "Golden Passport" enrollment visits to its facilities by Miami-Dade metro transit officials.  Exhibit A6.

152.    On information and belief, all the Defendant Clinics know that free public transportation is available.

153.    All of the Defendant Clinics' Miami-Dade facilities are served by Miami-Dade public transportation.

154.    Lack of necessity for free transportation creates the presumption that the service functions as an inducement for patients to use the Defendant Clinics.

155.    Humana does not offer transportation to all persons enrolled in its health insurance.   It limits transportation to certain federal program beneficiaries for whom it decides require greater inducements, such as Miami-Dade Medicare Part C and D beneficiaries.

156.    The Defendant Clinics transport patients and enrollees from their homes to Defendants' facilities and other locations, including shopping malls.

157.    Pasteur transports patients and enrollees to its facilities and other locations, including shopping malls and the Seminole Casino.

24

158.   Defendants offer home to clinic round-trip transportation.

159.   Defendants operate an aggregate fleet of over 200 vehicles.

160.   Thus, the Defendant Clinics transport potential patients and enrollees to their facilities, including many who seek transport for the sole purpose of enjoying free meals, free salon services, free massages, and other non-health related social and entertainment activities offered by the Defendant Clinics.

### *5.  Promotion of Transportation*

161.   The Defendant Clinics routinely offer free transportation services to current and prospective enrollees.

162.   The Defendant Clinics, with the Humana Defendant's knowledge, seek to induce member enrollment and retention in the Humana Defendants' Medicare Advantage Plans by marketing, promoting and providing free transportation to their facilities and other destinations.

163.   The Defendant Clinics advertise and promote free transportation on their English and Spanish websites.

164.   The Defendant Clinics advertise and promote free transportation in *Miami Herald* and *El Herald* advertisements.

165.   The Defendant Clinics advertised and promoted themselves and their offers of free transportation on the vehicles themselves.

166.   The bus ads are seen by hundreds of thousands of people per month in the communities in which the Defendant Clinics operate.

167.   CAC promotes transportation on its website of 92[9] "state-of-the-art" vehicles averaging "30,000 round trips each month!" [Emphasis original.]

168.   Humana offers free transportation in CAC's name since cacmedicalcenters.com, CAC's website, belongs to Humana and is administered by "domainadmin@humana.com" at Humana's headquarters, 500 West Main St., Louisville KY, 40202.

169.   MCCI promotes transportation on its website: "Transportation in our fleet of comfortable, air conditioned vans is included from your home to anywhere you need to go for medical care."

170.   MCCI promotes transportation it its brochures and on its website:

>        We understand how busy family members and caretakers can sometimes be -- for

---

[9]        92 vehicles, Exhibit A2, 11/9/10;  75 vehicles 3/31/10, Exhibit A4.

this reason, we offer free transportation to and from our centers for patients.
We offer free transportation and aim to make you feel right at home when you
visit.
Exhibits C4 and C5.

### B. Free Meals, Massages and Salon Services are Improper Inducements

171.   The Anti-Kickback Statute prohibits even an **offer** of remuneration that is likely to influence a choice of services.

172.   The Managed Care Manual at Chapter 4 prohibits the offering of meals, massages, hair care and salon benefits such as pedicures because they are not primarily health related.

173.   Because current enrollees may leave a Medicare Advantage program from one year to the next, the free meals, massages and salon services induce current members to continue their enrollment from one year to the next.

#### *1.  Offers of Free Meals*

174.   The Defendant Clinics offer free meals to Medicare beneficiaries who are patients covered by Medicare Part B and enrollees and potential enrollees in the Humana Defendants' Medicare Advantage Plans.

175.   The Defendant Clinics offer take-away containers so that patients, enrollees and potential enrollees can bring meals home with them.

176.   The Defendant Clinics offer free meals without regard to whether the person has a medical appointment or not.

177.   The Defendant Clinics offer free meals without regard to health or medical need.

178.   The Defendant Clinics offer free meals without regard to financial need.

179.   The Defendant Clinics offer free meals to Medicare beneficiaries who are not yet patients as well as offering free meals to current Medicare beneficiaries.

180.   Although the value of meals provided varies with consumption and frequency of consumption, there are no limits placed on how many dishes or servings may be taken or the frequency with which patients, enrollees, potential patients and potential enrollees may take meals provided by the Defendant Clinics.

181.   Thus, the offers for near daily and occasional weekend and holiday "party" meals are substantially in excess of $100 per year.

182.   For the most part, the Defendant Clinics do not track, document or otherwise record the identity of the Medicare beneficiaries who take meals or the value of what is provided to each Medicare beneficiary.

183.   The Defendant Clinics' provision of meals is a factor that induces Medicare beneficiaries to patronize the facilities of the Defendant Clinics and to enroll and remain enrolled in the Humana Defendants' Medicare Advantage plans.

184.   Because meals are served openly in the Defendant Clinics' facilities, including Humana's subsidiary MCCI, Humana knows or should know of the offers of meals.

### *2.  Offers of Free Massage and Salon Services*

185.   Pasteur and CAC offer free beauty salon services such as hair stylists, manicures, and pedicures ("salon services").

186.   MCCI and CAC offer free massages and, on information and belief, Pasteur also offers free massages.

187.   The following allegations exclude medically reasonable and necessary and health-related massages prescribed by medical professionals, and salon services required by hospitalized and home-bound patients.

188.   The Defendant Clinics' salon and massage services, other than those medically reasonable and necessary services excluded above, do not require a medical or health care appointment.

189.   The offered salon and massage services are not health-related and they are made available to all without regard to medical necessity.

190.   The Defendant Clinics offer salon and massage services without regard to financial need.

191.   Although the value of salon and massage services provided varies with consumption and frequency of consumption, there are no limits placed on frequency of massage or salon services.

192.   Thus, the Defendant Clinics offer salon services and massage services worth substantially in excess of $100 per year.

193.   The Defendant Clinics' offers of salon and massage services are intended by the Defendant Clinics to induce Medicare beneficiaries to patronize their facilities and to enroll and remain enrolled in the Humana Defendants' Medicare Advantage plans.

194.   Because salon and massage services are offered and provided openly in the Defendant Clinics' facilities, the Humana Defendants knows or should know of the offers.

27

195.   The Defendant Clinics have not disclosed to the Government material information that they are providing full meals to Medicare beneficiaries or prospective patients and enrollees, or massages or salon services, with values in excess of the nominal amounts allowed by law or any relevant exceptions.

### 3.   Particulars of CAC's Free Meals, Massages and Salon Services

196.   CAC offers transportation, massage, salon services and "lunch served daily" to potential and prospective enrollees through promotional materials.  Exhibit A-1 brochure (massage, salon services and "lunch served daily" – not Medicare approved communication) for all locations; Exhibit A-2 webpage (92[10] "state-of-the-art" vehicles averaging 30,000 round trips each month, complimentary lunch and massage at most locations, manicures at 4410 W. 16th Ave., Hialeah, Exhibit A-3 (transportation to wellness and activity center and "patients will be picked up and returned to residence"), Exhibit A-4.

197.   Humana, in CAC's name, offers free lunches "served daily" on CAC's website. Exhibit A6.

198.   CAC's website, cacmedicalcenters.com, is registered as the property of Humana and the registration shows it is administered by "domainadmin@humana.com" at Humana's headquarters, 500 West Main St., Louisville KY, 40202.

199.   At the CAC N. Miami Beach Med Center, 1648 NE 163rd St., N. Miami Beach, 33162, on October 5th or 6th, 2010, employee Jennifer LNU explained the following inducements: that lunch was served daily from one until two and takeaways allowed if requested.  Typical lunch was meat with rice and vegetables, white rice everyday and special birthday parties. Massage is offered once a month. José Ramirez, benefit consultant, and Minnie Casely, the wellness center activity coordinator, listened to all or part of the explanation and did not contradict Jennifer.

200.   At the CAC Westland Medical Center, 975 W 49th StreetHialeah FL, 33012, on October 7, 2010, employee Maddie LNU explained the following inducements:  Lunch is offered and provided daily including takeaway containers. Lunch on that day was chicken. Meatballs are served on different days. Transportation is provided to come in for lunch without regard for a

---

[10]          92 vehicles, Exhibit A2, 11/9/10;  75 vehicles 3/31/10, Exhibit A 4.

medical appointment. Massage is offered once a month. A manicurist was doing nails all day that day. She is there one day per month.

201.   The CAC West Hialeah Medical Center, 4410 West 16th Ave, Hialeah FL, 33012, offers the following inducements: lunch is served, including takeaways and even including frozen takeaways. On October 7, 2010, lunch was white rice, meat, plantains, but the options change daily. There are parties once a month.  Massage is provided once per month.

202.   At the CAC East Hialeah Medical Center, 2475 East 5th Ave., Hialeah FL 33013, Nancy Anne Torres, benefit consultant, explained the following inducements on October 12, 2010: Breakfast is served from 7:30 until 10:30 and lunch is served from 11:30 until 12:30. Take-away containers are provided. Lunch that day was rice, chicken and salad. Massage is offered. Nancy Torres provided printed information for Plan H1019.

203.   At the CAC Little Havana Medical Center, 1200 SW 1st St, Miami FL, 33135, on October 12, 2010, Madelyn Rivada, benefit consultant, and/or Ivelisse Lorenzo, wellness activities coordinator, explained the following inducements:

- Breakfast is described as "light drinks and snacks."
- Lunch is white rice, meat, vegetable juice and dessert.
- Takeaway containers are provided.
- Meals are available even if there is no medical appointment.

204.   Madelyn Rivada estimated that about 3,900 Medicare beneficiaries are enrolled at the 1200 SW 1st St. facility. There were about 85 people having lunch that day of white rice, chicken, and vegetables. The facility is also open Saturday and Sunday from 7 a.m. to 3 p.m.

205.   At the CAC Westchester Medical Center, 2350 SW 84th Ave., Miami FL, 33155, on October 12, 2010, Janet Ortiz, the CarePlus "agent," explained the following inducements: "Snacks" are served for breakfast; lunch is served from 11 to 12; lunch that day was white rice, black beans, shredded beef and carrots. The food is available without a medical appointment but enrollee must call to schedule the lunch. Massage is also provided.

206.   Ms. Ortiz offered lunch to a prospective enrollee, which was not accepted because the prospective enrollee had already been provided coffee and pastries by Dalia Martinez. Janet Ortiz estimated about a thousand people are enrolled at the Center and that it would soon be moving. They have Hispanic month celebrations and birthday parties (both with food).

207.    At the CAC Kendall Lakes Medical Center, 14736 N Kendall Dr., Miami FL, 33196, on October 14, 2010, Ibis Perez, benefits consultant, and Angel Lugo, wellness activity coordinator and "welcome committee," explained the following inducements:

- Breakfast is "bocaditos" (snacks).
- Lunch is offered daily and that day included chicken, yellow rice, red beans.
- Lunch takeaway containers are provided.
- Massage is provided.

208.    In-house activities in the activity center included parties, music, *hairdressers*, art, seminars, bingo and monthly birthday and *massage* celebrations with *pizza*, cake and ice cream.

209.    Manicures are offered to all and available once per week.

210.    At the CAC South Dade Medical Center, 18623 S Dixie Hwy, Miami FL, 33157, on October 14, 2010, Elizabeth Reyes, receptionist, explained the following inducements: Breakfast of snacks; lunch of hot rice, a meat and vegetables and takeaway containers are offered; coffee, sandwiches and pastries are available in the lobby all day.

211.    At the CAC, 18623 S. Dixie Highway, Miami on November 9, 2010, Antonio de Rose, benefits representative, confirmed that inducements include breakfast of coffee and pastries, lunch (sandwiches), that food is available even if a member does not have a medical appointment and that daily transportation is available without a medical appointment but that it is limited to once a day; that is, CAC will not provide breakfast transportation, a return home and then lunch transportation too.

212.    At the CAC, 10401 SW 40 St. Miami, on November 11 2010, Jose Losadas, benefits representative, confirmed that inducements include breakfast of coffee and pastries, lunch (sandwiches), that food is available even if a member does not have a medical appointment and that daily transportation is available without a medical appointment.

213.    At the CAC, 8686 Coral Way, Miami, on November 8 2010, Gloria LNU, benefits representative, confirmed that inducements include breakfast of coffee and pastries, lunch (sandwiches), that food is available even if a member does not have a medical appointment and that daily transportation is available without a medical appointment.

### *4.  Particulars of Pasteur's Free Meals, Massages and Salon Services*

214.    Pasteur offers transportation and salon services to potential and prospective enrollees through its promotional materials. Exhibit B-1 website ("over 100 new buses" and beauty salons), B-2 (Spanish, same), B-3 postcard referencing all locations and beauty salon, B-4 website (transportation).

215.    In 2006 a Special Master in a state court litigation found that Pasteur frequently provided free meals to current and prospective enrollees, and that it had no way to track the number of free meals.[11]

216.    The Special Master recommended:

> Based on Pasteur's frequent rendering of free meals to its patients and the lack of an existing tracking method to ensure compliance with the beneficiary Antikickback statute, the Special Master hereby recommends that Pasteur be required to create a cost tracking methodology to ensure compliance with the beneficiary Antikickback statute and to provide such methodology to the Court along with proof of compliance by Pasteur with this methodology.[12]

217.    The docket in that case does not reflect Pasteur complied with this recommendation.

218.    Pasteur informed the Special Master in that case that the cost of the lunches is supported by Humana subsidiary, CarePlus.[13]

219.    At the Pasteur Medical Center on 5900 Northwest 183 St., Miami Gardens, Florida, Laura, LNU, at the front desk explained on June 17, 2010, the following inducements:

- a full breakfast

- a "Cuban lunch" including, rice and beans, meat, bread, soft drink, and vegetables

- a monthly "birthday party" for all people born that month. Birthday parties include cake, drinks, singers, and entertainment

---

[11]         *WellCare of Florida, Inc. v Pasteur Medical Center, Inc.*, 05 - 24450 CA 22 11th Judicial Circuit in and for Miami-Dade County Florida, *Recommendation of Special Master,* August 31, 2006, pages 91 - 93 of 103, Bk 24864 Pg 761, 851 - 853.

[12]         Id. at p. 87.

[13]         Id.

31

- Transportation to various locations. According to Laura, "there is always a van ready" to take you any time a patient or enrollee wants to go. The wait might be a maximum of 10 to 15 minutes.

- On premises beauty salon that offers manicures, pedicures, hair styling, and other salon services. Use of the services does not require that a member have an appointment with a doctor.

220.    Laura further explained that *many people come in every day just to have lunch or breakfast and then have something done in a beauty salon and they don't require any sort of medical appointment. Some people take advantage of these services five- or six-days-a-week because it is like a social club.*

221.    A representative of the Pasteur Medical Center, 5900 NW 183 St, Miami, Florida, explained that the facility offered to members as of June 17, 2010 the following free services: Breakfast: Scrambled eggs, toast & butter, pastelitos, café au lait, Cuban coffee, orange juice

- Birthday parties: cake, soft drinks, chicken & rice, pastelitos, coffee;

- Holiday parties for members, family, and *friends* which includes a full meal buffet-style trays of pork, rice, fried plantains, bread, dessert, and

- live entertainment (strolling musicians, dance shows) for members, family and *friends*.

222.    Parties take place at rented halls in the area because they are huge affairs.

223.    At the Pasteur Medical Center, 5900 NW 183rd St, Miami, Florida, Sandra Cardon (305-763-6442), a customer service representative, explained during a conversation on November 1, 2010, the following inducements to enrollment:

- a beauty salon on premises

- hot lunch delivered daily to enrollees,  consisting of chicken or meat, rice and beans, vegetables or salad, and a drink

- Monthly parties (with food)

224.    At the Pasteur Medical Center, 4578 West 12th Ave., Hialeah, Florida, in a conversation regarding member benefits that took place on Thursday, October 28, 2010, Alby, LNU, said to speak with Lourdes and Al Lozano (Lozana) (786-488-0069), Director of Transportation. Alby gave a tour of the entire plaza, which had a recreation senior area with approximately 100 people playing dominoes. The patients and enrollees had been served lunch -- ground beef, white rice,

beans, salad and fruit with juice. The food is delivered in white take-out containers so that leftovers can be taken home.

225.    The main lobby at Pasteur Medical Center, 4578 West 12th Avenue, Hialeah, Florida, has a coffee bar with pastries that are available all day to anybody who walks up to the bar and asks. The Director of Transportation, Al Lozano, said that seniors go on different outings with free transportation provided by Pasteur to malls, Wal-Mart and, until recently, to the Seminole Indian Village for gambling. However, they have not been going to the Indian Village for the past few months.  He said they used to go twice a month.

226.    At the Pasteur Medical Center, 3721 NW 7th St. Miami, Florida, Isabel Paredes, (786-399-1512), "customer service" representative at the main location, 3713 NW 7th St., offered on Thursday, November 4, 2010, to take the blood pressure of a non-enrollee. She also invited the non-enrollee to stay for a hot lunch of macaroni with tomato sauce, onion and sliced hotdogs, juice and chocolate ice cream.

227.    The lunch was offered and provided free of charge at the recreation center, which held 25 tables in the back of the room and five tables in front. The center was full.

228.    Isabel Paredes said Pasteur offers its members planned events, dominoes, *hair salon services* and most enrollees are brought in by the medical facility's transportation and delivered home. This building also had a Director of Transportation office, pharmacy, *nail and hair salon*, and primary care doctors. There was a coffee bar with cookies in the rear of the building.

229.    At the Pasteur Medical Center, 9700 SW 24 St. Miami, Florida, Madeline, LNU, "membership" employee, said in a conversation about membership benefits on November 8, 2010, that this facility provided:

- Daily transportation to medical center without the need for a medical appointment
- Breakfast of coffee and pastries
- Hot lunches even if a member does not have a medical appointment
- Massage Therapy
- Hair Dresser
- Other free benefits, such as provision of cell phones with monthly minutes

230.   At the Pasteur Medical Center, 19177 S. Dixie Highway, Miami, Florida, Tatiana Ambruster, a "customer service" employee for Pasteur, explained in a conversation about member benefits held on November 9, 2010, the following inducements to membership:

- Daily transportation to the medical center for non-medical purposes to members who live as far away as the Florida Keys
- Breakfast of coffee and pastries
- Hot lunches-- even if the member does not have a medical appointment
- Massage Therapy
- Hairdresser
- Pedicure/Manicure
- Other free benefits, including *free cell phones with monthly minutes*

231.   A representative from the Pasteur Medical Center, 1247 W 44 Place, Hialeah, Florida, 33012, on April 8, 2010, explained that the facility offered transportation for medical appointments from home to clinic and back and to other doctors not in the medical center. It also offers and provides transportation to and from Adult Centers at the clinic centers where meals and snacks are provided free of charge and provides transportation to places such as Wal-Mart and other field trips.  Transportation is free even if the member has a car.

232.   The Pasteur Medical Center at 19177 S. Dixie Hwy., Miami, Florida, on Saturday, November 13, 2010, had set up a large tent for a grand opening of this Pasteur Medical Center. Hot meals were offered and provided to all, whether they were enrolled or not, including salad, chicken, yellow rice, cake and soda, a "handout" gift bag with a squeegee with Pasteur Medical in bold letters on it and their phone number and website, a seven-day pill box with Pasteur printed on it and a phone number with website and a plastic card holder with CarePlus Health Plans with their phone number printed on it, and a numbered raffle ticket. The community liaison, "Dr." Hipolito M. Leon, invited everyone to Westchester Thanksgiving celebration on November 30.

233.   Pasteur Medical Center, 9700 SW 24th St, Miami, Florida, on Saturday, November 20, 2010, 11 a.m. promoted membership with free food and gifts to potential enrollees. It provided live entertainment (five musicians and a female vocalist), bingo with prizes of Publix gift certificates, raffles with prizes, and hot meals and beverages.

234.    Lunch consisted of a tossed salad with shredded carrots, congri (black beans mixed with rice), shredded roast pork, Sprite or water and a piece of cake.

235.    The "medical center" lobby included a hair salon, a nail salon, referral office and transportation office. The second building (North) contained all medical offices, seating and waiting area and desks. Pasteur employees, Vera Yoslen 786-*728*-5939 [possibly *782*] (Spanish), Maria (786-422-6850), and Maria Nunez, 786-468-3469, had responsibility for calling prospective attendees to make sure they knew about the holiday party and would attend. Some prospective attendees were called twice before the event as a reminder.

236.    Pasteur employee, Esther D. [LNU], 786-269-8026, also made calls to prospective attendees to ensure they would come to the event. Maria Nunez was using Vera's phone at 11:19 on the November 20th when she made these phone calls and called on November 22nd from 786-422-6850 or 786-*728*-5939 [possibly *782*-].

237.    Pasteur bused in members of surrounding Pasteur centers to attend this party. The parking lot was full of Pasteur buses. Containers were provided to bring food home. An enrollee said that in 2009 they used to go to the casino in the Pasteur buses, which now takes them to the mall. Party attendees were offered and accepted gift bags containing a crunch ball, a pill case, and a plastic cardholder with "CarePlus" written on it.

238.    On information and belief, one or more of the Pasteur facilities use "Gaby's Cafe" 1351 SW 1 st St, Miami, Florida 33135, among others, to cater its meals.

### *5.  Particulars of MCCI's Free Meals, Massages and Salon Services*

239.    MCCI offers free transportation and massages to potential and prospective patients and enrollees through its websites and brochures.

240.    Each month MCCI posts an online calendar for each of its Miami-Dade, Broward and Palm Beach County locations, and each month these calendars have included offers of massages for the Miami-Dade locations. Sample pages at Exhibits C1, C2 and C3.

241.    MCCI offers free transportation to potential and prospective enrollees through a brochure offered to potential and prospective enrollees. Exhibit C4 ("courtesy transportation, eight Miami-Dade locations").

242.    At the MCCI 1600 NW 17th Ave, Miami, Florida, on Thursday, November 4, 2010 Sonya, the director of recreation, stated that patients or enrollees are served hot meals two or

three days per week. Sonya extended an invitation to a special event on Saturday, November 6, 2010 from 11:00 a.m. until 3 p.m. "to meet staff, have fun, eat and meet participants."

243.    On November 6, 2010, at 11:30 a.m. the outside parking lot at MCCI, 1600 NW 17th Ave., Miami, Florida, was full of chairs and picnic tables with a radio station 1270 Radio Caracol playing and one singer singing with radio master speaking and welcoming everyone to the MCCI outdoor celebration, promoting their medical center. There was a self-service refreshment table set up which included: cheese burgers, hot dogs, baked beans, lettuce, coleslaw, chocolate chip cookies, assorted individual bags of chips and sodas water in containers. Sonia, the director at this location, was handling a sign-up raffle ticket tent to win Publix [Florida grocery chain] giveaway certificates.

244.    At the MCCI, 470 NW 49th St., Hialeah, Florida, on Monday, November 1, 2010, Antonio was in the recreation room with about 40 to 45 people sitting at the tables. Antonio said there were about 5,000 active members at this site and at another location in the same shopping center, 440 W. 49th St., were the physicians' offices, pharmacy and information desk. There was also a small coffee area with free cookies. Antonio said there is no kitchen but hot food is brought in daily and that enrollees can bring their own lunch containers if they want to. Free transportation is also provided. Carilou (305-318-7163) was directing the "abuelos'" (grandparents') recreation room in the same shopping center. There was also a small beauty shop within the facility with about 18 people taking advantage of the free services. Carilou said the facility provided at no charge a good "hot" meal usually consisting of rice, meat, vegetable and a drink. They have planned parties at least once a month.

245.    At the MCCI medical facility at 9740 SW 40 St, Miami, Florida, on November 11, 2010, Dulce Muza, Member Services, described the following inducements:

- Breakfast consisting of coffee and pastries
- Meals served twice a week: lunch on Tuesdays – sandwiches, Thursdays - hot meals.
- Massage

246.    At the MCCI medical facility at 18469 S. Dixie Hwy, Miami, Florida, on November 9, 2010, Nenita Carreno, Administrator, described the following inducements:

- Breakfast of coffee and pastries
- Lunch of snacks

- Massage

247.   At the MCCI medical facility at 9740 SW 40th St., Miami Florida, on November 24, 2010, Elvira Lagoa, Center Administrator, explained that Dulce was on vacation and that 25 to 30 members regularly come every day without medical appointments just for the entertainment.

- Monday is massage day, not in a medical area but in a separate building.

- Tuesday a pianist plays music.

- Wednesday is Cuban sandwiches (roast pork, ham, Swiss cheese, butter or oil, condiments, on a Cuban bread (similar to baguette) catered from El Rinconcito Latino, Bird Rd. and 104 Ave., Miami, Florida.

- Friday is a theater production with hot meals catered by El Rinconcito Latino, Bird Rd. and 104 Ave., Miami, Florida.

248.   El Rinconcito Latino, Bird Rd. and 104 Ave. Miami, Florida, charges $4.65 for a regular Cuban sandwich and $6.15 for a large. El Rinconcito's least expensive hot lunch specials (beverage not included) range from $6.60 (roast chicken, white rice and beans); $7.85 chicken "steak", beans, rice and plantains); $7.15 (fried pork chops, dark rice and plantains); $7.55 (codfish casserole, rice and plantains). The least expensive beverages, soda or iced tea, are $1.10. State and local sales taxes and a tip bring a single hot lunch total to $10 or more.

## C. Defendants Conspired to Commit the Above Violations

### 1. The Parties' Agreements

249.   Defendants conspired and were complicit in the fraudulent scheme to get false or fraudulent claims paid.

250.   The Humana Defendants enter into Independent Practice Association Participation Agreements with their healthcare providers, such as CAC, MCCI and Pasteur.

251.   Humana Medical Plan Inc. (a Florida health maintenance organization), Humana Health Insurance Company of Florida Inc. (a Florida insurance company), and Humana Insurance Company (an insurance company) and their affiliates and MCCI Group Holdings, LLC (as the Independent Practice Association ("IPA")) entered into an IPA Participation Agreement covering the Jacksonville and Orlando market areas.

252.    The Agreement is 37 pages [pages 34-37 appear identical], including nine "attachments" (A through I) and appears to have originated from a Humana template since the internal references for MCCI are all to "IPA."

253.    Page 34 incorporates by reference a portion of a South Florida agreement: "Please find the attached MCCI Group Holdings, LLC agreement to allow MSO operation in the Orlando Market and Jacksonville Market. Currently the provider has an existing agreement in South Florida. … Stop loss and reserve fund will be same as South Florida."

254.    The agreement requires compliance with regulatory requirements (paragraphs 22.1 and 22.2) and a non-compete provision (25.1 and 25.2).

255.    The non-compete provision limits MCCI from competing for a period of one year following the termination of the Agreement and covers six North Florida counties.

256.    The significance of the non-compete provision is that it evidences the importance of MCCI's referrals to Humana.

257.    Attachment I at pages 30 through 32 is titled "Medicare Advantage Provisions" and provides in part:

> d. IPA agrees to cooperate with Humana in its efforts to monitor compliance with its Medicare Advantage contracts and/or Medicare advantage rules and regulations and to assist Humana in complying with corrective action plans necessary for Humana to comply with such rules and regulations.
> e. IPA agrees that nothing in the Agreement shall be construed as relieving Humana of its responsibility for performance of duties agreed to through its Medicare advantage contracts existing now or entered into in the future with CMS.
> f. IPA agrees to comply with and be subject to all applicable Medicare program laws, rules and regulations, reporting requirements, and CMS instructions as implemented and amended by CMS. This includes without limitation, federal and state regulatory agencies including, but not limited to HHS … as well as all other federal and state laws, rules and regulations applicable to individuals and entities receiving federal funds. …
> ...
> h. IPA agrees in the event certain identified activities have been delegated to IPA under the agreement, any subdelegation of the noted activities by IPA requires the prior written approval of Humana. Notwithstanding anything to the contrary in the Agreement, Humana will monitor IPA's performance of any delegated activities on an ongoing basis and hereby retains the right to modify, suspend or revoke such delegated activities in the event Humana and/or CMS determines, in their discretion, that IPA is not meeting or has failed to meet its obligations under the agreement related to such delegated activities.  . . .

> i.  IPA agrees to comply with Humana's policies and procedures.
> . . .
> k.  IPA agrees that payment from Humana for services rendered to Humana's
> Medicare Advantage Members is derived, in whole or in part, from federal funds
> received by Humana from CMS.

258.    Relator infers Humana and MCCI's Miami contract is similar since it is incorporated by reference in the Orlando Agreement.

259.    On information and belief, Relator infers that the Humana Defendants have similar agreements with Pasteur and CAC (a Humana subsidiary) governing their Miami-Dade County arrangement.

260.    In 2006, for example, Pasteur provided daily free lunch to Medicare beneficiaries and reported to a Special Master, presumably under oath, that the cost of lunch given to beneficiaries "is supported by CarePlus" (the Humana subsidiary).[14]

### *2.  The Parties' Acts in Furtherance of their Conspiracy*

261.    The parties acted in furtherance of their conspiracy as detailed in the "Particulars Of" subsections above at A2, A5, and B3 – B5 and those sections and their allegations are incorporated by reference.

### *3.  The Parties' Intent to Defraud*

262.    The Parties' intent to defraud is detailed below, in section F below.

### F.  Defendants Acted Knowingly

### *1.  Humana Knows the Defendant Clinics' Conduct Is Unlawful*

263.    The Humana Defendants know or had reason to know their conduct was unlawful since Humana's Principles of Business Ethics state that such conduct is unlawful:

> You should not give gifts, *meals*, favors, *travel* or entertainment to . . . customers.
> . . ."
> **The federal anti-kickback laws that apply to Medicare and Medicaid
> prohibit persons or entities from knowingly *offering*, paying, soliciting, or
> receiving *remuneration of any kind* to induce the referral of business under a
> federal program. In addition, most states have laws that prohibit kickbacks
> and rebates.**

---

[14]     *WellCare of Florida, Inc. v Pasteur Med. Ctr, Inc.*, 05-24450 CA 22 11th Judicial Circuit in and for Miami-Dade County Florida, *Recommendation of Special Master,* Aug. 31, 2006, pps. 91 - 93 of 103, Bk 24864 Pg 761, 851 - 853.

**Also related to marketing to Medicare enrollees,** health plans are specifically prohibited from providing any kind of remuneration to entice beneficiaries to join our plans, **although the government recognizes that providing very nominal items (defined as having a retail value of $15) in the course of marketing activities is acceptable.**
*Humana Principles of Business Ethics*[15]
[emphasis supplied]

264.   Defendants know free meals are prohibited because they are prohibited in the Managed Care Manual.

[A]ll benefits must be primarily health related. While nutritional counseling is a desired aspect of case and/or disease management, the provision of meals, meal vouchers or grocery vouchers to individuals, without an underlying need based on an actual illness, cannot be classified as a health care benefit, because it is not primarily  health-care related in nature.
...
Social factors by themselves cannot justify classification of a nutritional service as an MA benefit. Social factors include limited income, an inability to pick up meals, poverty, dual eligible status, poor diet – even if measured by recognized survey instruments, or general statements by a provider that improved nutrition would result in better health status.

265.   Defendants know salon services, manicures, pedicures and massage services are prohibited because they are expressly prohibited in the Managed Care Manual. Ch. 4-3.03, Table II.

266.   Humana is aware of the provision of transportation by the Defendant Clinics because Humana's CarePlus subsidiary runs full-page Miami Herald ads jointly with CAC to promote its CarePlus plans with the promise of "$0 for unlimited transportation."

267.   One purpose served by providing vehicles that seat 12 to 25 people is so Defendants can misrepresent to the Government that they provide mere "bus" service, thereby avoiding the label of prohibited *luxury* transportation.

268.   One purpose of Defendants' provision of free transportation, meals, massages, manicures and pedicures is to induce patient patronage and member enrollment and reenrollment.

269.   In 2006 litigation, a Special Master's Report states that Pasteur informed the Special Master that the cost of lunch given to beneficiaries "is supported by CarePlus" (the Humana

---

[15]      Humana Principles of Business Ethics  pp. 15 – 19. The government views $15 per inducement or $50 per year as the threshold

subsidiary), that many beneficiaries enjoy daily free lunch, and that Pasteur "currently has no tracking method to ensure that it does not go over [the annual AKS $50] per person limit."[16]

270.    The Special Master recommended that Pasteur create a meal cost-tracking methodology to ensure compliance with the Anti-Kickback Statute. *Id*.

271.    On information and belief, Pasteur still has no meal cost-tracking methodology in use.

### 2. Humana's Express Certifications Show Knowledge of Unlawful Conduct

272.    An organization must complete a *certified* Part C Medicare Advantage Application ("Application" or "Contract") to be accepted into the Medicare Advantage program. 42 C.F.R. § 422.501(b).

273.    To qualify as an MA organization, enroll Medicare beneficiaries and be paid on behalf of Medicare beneficiaries enrolled in the plan, an organization must enter into a contract with CMS. 42 C.F.R. § 422.503(a).

274.    Mandatory contract provisions include a requirement that the organization "agrees to comply with (1) Federal laws and regulations," including applicable provisions "of the anti-kickback statute (section 1128B(b) of the Act)."

275.    Medicare Advantage Plan regulations specifically name the AKS as a law "designed to prevent or ameliorate fraud, waste, and abuse." 42 C.F.R. § 422.504(h)[17]; § 423.505(h).

276.    Humana and its subsidiary corporations entered into one or more such Contracts with the Government, including H1019 and H1036 and others (the "Contracts").

277.    The Contracts between Centers for Medicare & Medicaid Services and Humana were renewed many times, including as of January 1, 2010 and January 1, 2011.

278.    Managed Care organizations, such as the Humana Defendant, are required each month to "request payment under the contract" on a document in which they certify the accuracy, completeness, and truthfulness of certain data requested by HCFA "as a condition for receiving a monthly payment" of capitated fees. 42 C.F.R. § 422.502(l).

---

[16]    *WellCare of Florida, Inc. v Pasteur Med. Ctr., Inc*., 05-24450 CA 22 11ᵗʰ Judicial Circuit in and for Miami-Dade County Florida, *Recommendation of Special Master,* Aug. 31, 2006, p. 92.

[17]    (h) *Requirements of other laws and regulations.*  The MA organization agrees to comply with-

(1) Federal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to, applicable provisions of Federal criminal law, the False Claims Act (31 U.S.C. 3729 et. seq.), and the anti-kickback statute (section 1128B(b)) of the Act);

279.   As part of the certification, the organization must "certify that each enrollee for whom the organization is requesting payment is validly enrolled. . . ." 42 C.F.R. § 422.502(l)(1).

280.   Humana and the other Defendants agreed to comply with the Anti-Kickback statute as a precondition of Medicare payment.

281.   As part of the Applications, Defendant Humana made and regularly reaffirmed numerous express "attestations," including attestations that it would implement a Compliance Plan in accordance with the requirements of 42 C.F.R. § 422.503(b)(4).

282.   The Compliance Plan sets forth Humana's commitment to abide by all applicable Federal regulations, guidelines and standards and all state laws and regulations that federal law does not pre-empt.

283.   Humana agreed to comply with all CMS regulations and guidance, including but not limited to the Managed Care Manual, which contains additional prohibitions against improper gifts and inducements to beneficiaries.

284.   Humana agreed to comply with all CMS regulations and guidance pertaining to marketing, enrollment, disenrollment and eligibility including, but not limited to, the Managed Care Manual.

285.   The Managed Care Manual referred to above explicitly requires that any promotional activities or items offered by Defendants, including those that will be used to encourage retention of members, must be of nominal value and must be tracked and documented during the contract year.

286.   The Managed Care Manual's 2010 revisions prohibit Defendants from offering or giving remuneration to induce the referral of a Medicare beneficiary or to induce a person to purchase, or arrange for, or recommend the purchase or ordering of an item or service paid in whole or in part by the Medicare program.

287.   In addition to express contractual certifications, an MA provider, while under contract, continues to make additional representations, including a monthly certification of contract compliance as part of its request for payment.

288.   The current monthly attestation includes, for example:

> I further attest that these benefits will be offered in accordance with all applicable Medicare program authorizing statutes and regulations and program guidance that CMS has issued to date and will issue during the remainder of 2009 and 2010,

including but not limited to, the 2010 Call Letter, the 2010 Solicitations for New
Contract Applicants, the Medicare Prescription Drug Benefit Manual, the
Medicare Managed Care Manual, and the CMS memoranda issued through the
Health Plan Management System (HPMS).

289.   The Humana Defendants' contracts and the Managed Care Manual mandate that the
Humana Defendants monitor and ensure compliance with federal and state laws affecting the
rights of enrollees including, but not limited to, federal laws and regulations designed to prevent
or ameliorate fraud and waste, such as the False Claims Act and the Anti-Kickback statute. 42
C.F.R. § 422.504(h).

290.   The Humana Defendants' contracts and the Managed Care Manual mandate that
Defendants adhere to CMS marketing provisions. 42 C.F.R. § 422.80(a), (b) and (c).

291.   Truthfully attesting to compliance or future compliance with the applicable laws, statutes
and guidelines contained in the "Part C Medicare Advantage Application" is a condition of
participation in the MA program, which is necessarily a condition of payment by the
government.

292.   The Humana Defendants received a capitation payment from CMS each month for each
plan enrollee as a result of a monthly certification for payment.

293.   In addition to the requirements at 42 C.F.R. § 422.502(l)(1), the Medicare Managed Care
Manual, Chapter 11, § 130 (Certification of Data That Determine Payment Requirements) also
requires MA organizations to attest each month that "each enrollee for whom the organization is
requesting payment is validly enrolled in an MA plan offered by the organization." Medicare
Managed Care Manual, Chapter 11, App. A (Certification of Monthly Enrollment and Payment
Data Relating to CMS Payment to a Medicare Advantage Organization) (monthly certification).

294.   David Jarboe, CEO of Careplus and CAC  certified monthly that "each enrollee for whom
the organization is requesting payment is validly enrolled in an MA plan offered by the
organization."

### *3.  MIPPA's Prohibitions Made Defendants' Conduct Knowingly Unlawful*

295.   Defendants know or have reason to know their conduct is unlawful since the Medicare
Improvements for Patients and Providers Act of 2008 (MIPPA) established prohibitions and
limitations for Medical Advantage (MA) plans and Medicare Prescription Drug plans (PDPs) on
certain sales and marketing activities.

43

296.    MIPPA expanded the list of expressly prohibited marketing activities beginning in 2009 to include providing **meals**, gifts, marketing in health care settings or at educational events, etc. 42 U.S.C. § 1395w–21(j).

297.    MIPPA prohibits the offering of gifts to potential enrollees unless the gifts are of nominal value, and prohibits providing meals of any value to beneficiaries while conducting marketing activities. 42 U.S.C. § 1395w–21(j), *see* 42 C.F.R. § 422.2268 and for Prescription Drug Plan marketing, §423.2268(b).

### *4.  The Managed Care Manual Made Defendants' Conduct Knowingly Unlawful*

298.    The definition of "marketing" includes "Steering, or attempting to steer, a potential enrollee towards a plan, or limited number of plans."  "Definitions," § 20 of the Marketing Guidelines.

299.    CMS's definition of marketing extends beyond printed materials to include *activities*, conducted by the plan sponsor or an individual or organization on behalf of the plan sponsor, *that steer or attempt to steer, a potential enrollee toward a plan*, or limited number of plans, for which the individual or entity performing marketing activities expects compensation directly or indirectly for such marketing activities.

300.    CMS's authority for marketing oversight encompasses various materials and activities.

301.    Direct or indirect marketing of Humana's plans by the Humana Defendants and their providers CAC, Pasteur and MCCI, is considered by CMS marketing by Humana.

302.    The CMS Managed Care Manual [the "Manual"] clarifies that, with few exceptions, a current enrollee (who is also a potential enrollee for the following year) may not be provided meals. Managed Care Manual, Chapter 4, §30.5 – *Meals;* Chapter 3, Medicare Marketing Guidelines, 70.2.1 - Exclusion of Meals as a Nominal Gift.

303.    The Manual clarifies that meals are not permissible unless they are "primarily health related." (Emphasis in original).

304.    Since at least June 2007 Defendants knew or should have known that meals were not allowed:

> All benefits must be health care services (42 CFR 422.2).  While nutritional counseling is a desired aspect of case and/or disease management, the provision of "meals",  "meal vouchers" or grocery vouchers to individuals, without an underlying health care need, *cannot be classified as a health care benefit, because it is not primarily health-care related in nature* (See §10.10 of

44

this chapter).

Therefore, to be classified as a benefit under the MA program the nutritional service *must be based on an underlying medical need*, or reason - consistent with the normal pattern of delivery of care for this illness, - that requires either home delivery of meals, a special diet, or special diet foods. For example, meals, immediately post-hospitalization for a specific limited number of days, to continue the required caloric or dietary needs of the patient, may be offered as a supplemental benefit.

*Social factors by themselves, such as limited income, or an inability to pick up meals cannot justify a classification of a nutritional service as an MA benefit.*

[emphasis supplied] 20.24 - Meals  (Rev. 87; Issued: 06-08-07)

305.    The Manual, at Chapter 4-30.3 Table II lists services that may <u>not</u> be offered as supplemental benefits including:

- Beauty salons --  "Its primary purpose is cosmetic."

- Manicures / Pedicures -- "The primary purpose is cosmetic."

- Massages -- "Massages by themselves are not benefits (even if offered by a state licensed massage therapist"

306.    The Manual further clarifies that massages are and are not permissible[18]:

Example 4 - Massage Therapy: Under specific and limited circumstances, for certain injuries, Original Medicare will cover massages as part of an occupational therapy benefit. While an MAO must offer "Occupational Therapy," *it should not in its marketing materials single out any particular aspect of this coverage, such as massage therapy and indicate that it offers "massage therapy"* as a benefit. An MAO may, however, offer "chiropractic visits" as a benefit, even though the chiropractor may use preparatory massage therapy during the visit. *However, the description of the benefit should be "chiropractic visits" without use of the word "massage."*
(Emphasis supplied)

307.    Compliance with the Managed Care Manual is a prerequisite to the Government's decision to fund and continue to fund Medicare Advantage Organizations.

308.    CMS Marketing Guidelines for MA plans recognize that one year's *current* enrollees are the following year's *potential* enrollees.

---

[18]    Managed Care Ch 4  30.8 – Supplemental Benefits Extending Original Medicare Benefits (Rev. 92, Issued:  12-18-09; Effective/Implementation Date:  12-18-09)

### *5.   The Anti-Inducement Statute Informs Defendants of Their Unlawful Conduct*

309.   Defendants know or have reason to know their conduct is unlawful since the Anti-Inducement Statute, § 1128A(a)(5) of the Social Security Act [42 U.S.C. § 1320a–7a], authorizes the imposition of civil monetary penalties against health care providers that *offer* or transfer remuneration to Medicare and Medicaid beneficiaries in order to influence their selection of a particular provider.

310.   The Anti-Inducement Statute defines "remuneration" to include transfers of items or services for free or for other than fair market value that a provider *knows or should know* is likely to influence such individual to order or to receive any item or service from a particular provider. 42 U.S.C. §1320a-7a(a)(5). *See also* 42 C.F.R. § 1003.102(b)(13).

311.   The following activities fall within the ambit of the Federal Anti-Inducement Statute:

- Free transportation services
- Free meals, and also free snacks with an aggregate annual value in excess of a nominal amount
- Free beauty salon services such as haircuts and styles
- Free manicures and pedicures
- Free massages

312.   The "should know" standard is met if a provider acts with deliberate ignorance or reckless disregard. No proof of specific intent is required. *See* 42 C.F.R. § 1003.101.

### *6.   The OIG Informs Defendants of Their Unlawful Conduct*

313.   Defendants know their conduct is unlawful since the OIG's Special Advisory Bulletin "Offering Gifts and Other Inducements to Beneficiaries," August 2002, put all providers on notice of the risks of providing valuable gifts and transportation to current and prospective patients and enrollees.

314.   In the "Offering Gifts and Other Inducements to Beneficiaries" section, the OIG stated that it considers the provision of free goods or services to existing customers who have an ongoing relationship with a provider likely to influence those customers' future purchases.

315.   Defendants know or should know their conduct is unlawful under HHS OIG Advisory Opinions No. 00-7, 09-01, and 11-02 which provide guidance on free transportation. The opinions put Defendants on notice that free transportation could generate prohibited

46

remuneration under the Anti-Kickback Statute and the Anti-Inducement Statute where there is the requisite intent to induce referrals to a federally funded healthcare program such as that provided by Defendants.

316.    Defendants know their conduct is unlawful since Defendants affirmatively acknowledged this prohibition by signing documents that were filed with the government such as the monthly "Certification of Monthly Enrollment and Payment Data" signed by the Humana Defendants.

### V.  Counts I to VII

### Count I -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims Presented to Medicare Parts B, C, and D by the Defendant Clinics

Relator re-alleges and incorporates by reference the allegations in paragraphs 1- 316 above.

317.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., against the Defendant Clinics.

318.    Through the acts described above, the Defendant Clinics knowingly presented: (1) directly to the fiscal agents of CMS false or fraudulent claims for payment or approval under Medicare Part B; and (2) indirectly to CMS through the Humana Defendants, as Medicare Advantage contractors, false or fraudulent claims for payment or approval under Medicare Parts C & D.

319.    All of the claims presented by the Defendant Clinics after December 17, 2000, were legally false or fraudulent because all such claims were tainted by the above-described violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

320.    Federal law and the Defendant Clinics' Medicare Enrollment Applications on CMS Form 855 made compliance with these statutes a pre-condition to payment under Medicare Part B. The enrollment applications stated specifically that "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." Exhibit F3.

321.    Medicare regulations require that Medicare providers present claims for services rendered to beneficiaries under Medicare Part B on CMS Forms 1500 and/or UB 92 (CMS 1450) or their electronic equivalents. Exhibits F1 and F2. Also, on information and belief, the Humana IPA

Participation Agreements applicable to services provided by the Defendant Clinics under Medicare Parts C & D require submission of "all claims and encounters to Humana or its designee as applicable using the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") compliant 837 electronic format or a CMS 1500 and/or U8-92 or their successors. . . ." *See e.g.*, Exhibit D2, MCCI Humana IPA *Orlando* Agreement.pdf, p 7, paragraph 15.1.

322.    The CMS 1500 form states that "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." The UB 92 (CMS 1450) Form states "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." Exhibit F1.

323.    Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are material to Medicare's payment decision, failure to disclose violations of those statutes on CMS Forms 1500, 1450 or their electronic equivalents renders such claims legally false or fraudulent.

324.    Because the Defendant Clinics hold themselves out to the public in their marketing materials as Medicare providers serving a population of senior citizens in the Miami-Dade County area, there are reliable indications that numerous false or fraudulent claims on CMS Forms 1500, 1450 or their electronic equivalents were in fact presented to fiscal agents of CMS by the Defendant Clinics, either directly under Medicare Part D, or indirectly through the Humana Defendants under Medicare Parts C & D, after the Defendant Clinics commenced violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

325.    As a result of the presentment of these false or fraudulent claims from and after December 17, 2000, the United States has been damaged and continues to be damaged in an amount yet to be determined.

### Count II -- 31 U.S.C. §3729(a)(1)(B):  False Statements Material to Claims Under Medicare Parts B, C, and D by the Defendant Clinics

Relator re-alleges and incorporates by reference the allegations in paragraphs 1- 316 above.

326.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq., against the Defendant Clinics.

327. Through the acts described above, the Defendant Clinics knowingly made or used false statements material to claims presented: (1) directly to the fiscal agents of CMS under Medicare Part B; and (2) indirectly to CMS through the Humana Defendants, as Medicare Advantage contractors, under Medicare Parts C & D.

328. The Defendant Clinics' Medicare Enrollment Applications on CMS Form 855 contained false promises of compliance with the Anti-Kickback Statute and the Anti-Inducement Statute which the Defendant Clinics had no intention of honoring. The enrollment applications stated specifically that "I understand that payment of a claim by Medicare is conditioned upon the claim and the underlying transaction complying with [Medicare] laws, regulations, and program instructions (including, but not limited to, the Federal anti-kickback statute and the Stark law), and on the supplier's compliance with all applicable conditions of participation in Medicare." Exhibit F3.

329. Medicare regulations require that Medicare providers present claims for services rendered to beneficiaries under Medicare Part B on CMS Forms 1500 and/or UB 92 (CMS 1450) or their electronic equivalents. Exhibits F1 and F2. Also, on information and belief, the Humana IPA Participation Agreements applicable to services provided by the Defendant Clinics under Medicare Parts C & D require submission of "all claims and encounters to Humana or its designee as applicable using the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") compliant 837 electronic format or a CMS 1500 and/or U8-92 or their successors. . . ." *See e.g.*, Exhibit D2, MCCI Humana IPA *Orlando* Agreement.pdf, p 7, paragraph 15.1.

330. The CMS 1500 form states that "NOTICE: Any person who knowingly files a statement of claim containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." The UB 92 (CMS 1450) Form states "[s]ubmission of this claim constitutes certification that the billing information as shown on the face hereof is true, accurate and complete. That the submitter did not knowingly or recklessly disregard or misrepresent or conceal material facts." Exhibit F1.

331. Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are material to Medicare's payment decision, the Defendant Clinics impliedly certified each time they presented a claim on CMS Forms 1500, 1450 or their electronic equivalents that they were

in compliance with the Anti-Kickback Statute and the Anti-Inducement Statute.  All such certifications were false and constitute false statements material to false or fraudulent claims.

332.    Because the Defendant Clinics hold themselves out to the public in their marketing materials as Medicare providers serving a population of senior citizens in the Miami-Dade County area, there are reliable indications that numerous false or fraudulent claims on CMS Forms 1500, 1450 or their electronic equivalents were in fact presented to fiscal agents of CMS by the Defendant Clinics, either directly under Medicare Part D, or indirectly through the Humana Defendants under Medicare Parts C & D, after the Defendant Clinics commenced violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

333.    As a result of these false statements and certifications from and after December 17, 2000, the United States has been damaged and continues to be damaged in an amount yet to be determined.

### Count III -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims Presented to Medicare  Parts C and D by the  Humana Defendants

Relator re-alleges and incorporates by reference the allegations in paragraphs 1- 316 above.

334.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the Humana Defendants.

335.    Through the acts described above, the Humana Defendants knowingly presented to the fiscal agents of CMS false or fraudulent claims for payment or approval under Medicare Parts C & D.

336.    All of the claims presented by the Humana Defendants under Medicare Parts C & D after after December 17, 2000, were legally false or fraudulent because all such claims were tainted by the above-described violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

337.    Federal law and the Humana Defendants' Medicare Advantage Organization Contracts with Medicare on the Form attached as Exhibit D-1 made compliance with these statutes a pre-condition to payment under Medicare Parts C & D.  The contracts stated specifically, in Article IX (A), that "The MA Organization agrees to comply with . . . [f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to . . . the anti-kickback statute  . . . . "

338.    The contracts further stated in Article V (A) and (C) that "Notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors, the MA Organization maintains full responsibility for adhering to and otherwise fully complying with all terms and conditions of its contract with CMS . . . . The MA Organization agrees that all contracts or written arrangements into which the MA Organization enters with providers, related entities, contractors, or subcontractors (first tier and downstream entities) shall contain the following elements: . . . . A provision requiring that any services or other activity performed by a related entity, contractor or subcontractor in accordance with a contract or written agreement between the related entity, contractor, or subcontractor and the MA Organization will be consistent and comply with the MA Organization's contractual obligations to CMS.

339.    Medicare regulations and the Medicare Advantage Organization Contract Form attached as Exhibit D-1 require that the Humana Defendants make monthly claims or requests for capitation payments on the form attached as E-1 as to each beneficiary "validly enrolled." The contract states in Article IV (C) that "[a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO) . . . must request payment under the contract on the forms attached hereto . . . ."

340.    Medicare regulations state that, as part of the certification, the organization must "certify that each enrollee for whom the organization is requesting payment is validly enrolled.  . . ." 42 C.F.R. § 422.502(l)(1) (emphasis added).  Any enrollee obtained via kickbacks and illegal inducements is not validly enrolled.

341.    The Humana Defendants did in fact make monthly claims for payment on the Certification of Monthly Enrollment and Payment Data form attached as Exhibit E-1, stating that "the Organization hereby requests payment under the contract, and in doing so, makes the following certifications concerning CMS payments to the Organization."  The certification of enrollees implicitly included the certification required by 42 C.F.R. § 422.502(l)(1) that all such enrollees were "validly enrolled."

342.    Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are material to Medicare's payment decision, failure to disclose on the claim form attached as

Exhibit E-1 that beneficiaries were not "validly enrolled" because they were obtained through violations of those statutes renders all such claims legally false or fraudulent.

343.   CMS also requires the Humana Defendants to submit, for purposes of calculating future-year capitation rates, cost data provided by the Defendant Clinics on the CMS forms 1500 and 1450.  Because accuracy of this data is vital to the integrity of the Medicare Advantage program, submission of tainted cost data inflated by violations of the Anti-Kickback Statute and the Anti-Inducement Statute is material to the Government's decision to pay the Humana Defendant's capitation claims.

344.   As a result of the Humana Defendants' presentment of these false or fraudulent claims from and after December 17, 2000, the United States has been damaged and continues to be damaged in an amount yet to be determined.

### Count IV -- 31 U.S.C. §3729(a)(1)(B):  False Statements Material to Claims Presented to Medicare  Parts C and D by the  Humana Defendants

Relator re-alleges and incorporates the allegations in paragraphs 1-316 as if fully set forth herein.

345.   This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the Humana Defendants.

346.   Through the acts described above, the Humana Defendants knowingly made or used false statements material to claims presented to the fiscal agents of CMS under Medicare Parts C & D.

347.   The Humana Defendants' Medicare Advantage Organization Contracts with Medicare on the Form attached as Exhibit D-1 contained false promises of compliance with the Anti-Kickback Statute and the Anti-Inducement Statute which the Humana Defendants had no intention of honoring. The contracts stated specifically, in Article IX (A), that "The MA Organization agrees to comply with . . . [f]ederal laws and regulations designed to prevent or ameliorate fraud, waste, and abuse, including, but not limited to . . . the anti-kickback statute  . . . ."

348.   The contracts further stated in Article V (A) and (C) that "Notwithstanding any relationship(s) that the MA Organization may have with related entities, contractors, or subcontractors, the MA Organization maintains full responsibility for adhering to and otherwise

fully complying with all terms and conditions of its contract with CMS . . . . The MA Organization agrees that all contracts or written arrangements into which the MA Organization enters with providers, related entities, contractors, or subcontractors (first tier and downstream entities) shall contain the following elements: . . . . A provision requiring that any services or other activity performed by a related entity, contractor or subcontractor in accordance with a contract or written agreement between the related entity, contractor, or subcontractor and the MA Organization will be consistent and comply with the MA Organization's contractual obligations to CMS.

349.    Medicare regulations and the Medicare Advantage Organization Contract Form attached as Exhibit D-1 require that the Humana Defendants make monthly claims or requests for capitation payments on the form attached as E-1 as to each beneficiary "validly enrolled." The contract states in Article IV (C) that "[a]s a condition for receiving a monthly payment under paragraph B of this article, and 42 CFR Part 422 Subpart G, the MA Organization agrees that its chief executive officer (CEO) . . . must request payment under the contract on the forms attached hereto . . . ."

350.    Medicare regulations state that, as part of the certification, the organization must "certify that each enrollee for whom the organization is requesting payment is validly enrolled. . . ." 42 C.F.R. § 422.502(l)(1) (emphasis added).  Any enrollee obtained via kickbacks and illegal inducements is not validly enrolled.

351.    The Humana Defendants did in fact make monthly claims for payment on the Certification of Monthly Enrollment and Payment Data form attached as Exhibit E-1, stating that "the Organization hereby requests payment under the contract, and in doing so, makes the following certifications concerning CMS payments to the Organization." The certification of enrollees implicitly included the certification required by 42 C.F.R. § 422.502(l)(1) that all such enrollees were "validly enrolled."

352.    Because violations of the Anti-Kickback Statute and the Anti-Inducement Statute are material to Medicare's payment decision, the Humana Defendants expressly or impliedly certified each time they presented a claim that they were in compliance with the Anti-Kickback Statute and the Anti-Inducement Statute.  All such certifications were false and constitute false statements material to false or fraudulent claims.

53

353.   CMS also requires the Humana Defendants to submit, for purposes of calculating future-year capitation rates, cost data provided by the Defendant Clinics on the CMS forms 1500 and 1450.  Because accuracy of this data is vital to the integrity of the Medicare Advantage program, the Humana Defendants impliedly certified that all sub-contractor claims data submitted to CMS was free from violations of the Anti-Kickback Statute and the Anti-Inducement Statute.

354.   As a result of these false statements and certifications from and after December 17, 2000, the United States has been damaged and continues to be damaged in an amount yet to be determined.

**Count V -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims The Humana Defendants Caused the Defendant Clinics to Present to Medicare Parts B, C, and D**

Relator re-alleges and incorporates the allegations in paragraphs 1-316 as if fully set forth herein.

355.   This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the Humana Defendants.

356.   By providing financial and marketing assistance to the Defendant Clinics and otherwise aiding and abetting the clinics' inducement of potential patients to choose the clinics as their health care providers, knowing and foreseeing that the Defendant Clinics would present claims tainted by violations of the Anti-Kickback Statute and the Anti-Inducement Statute as set forth in Count I above, the Humana Defendants caused the Defendant Clinics to present false or fraudulent claims to Medicare Parts B, C and D.

357.   As a result of the presentment of these false or fraudulent claims, from and after December 17, 2000 to the present, the United States has been damaged and continues to be damaged in an amount yet to be determined.

**Count VI -- 31 U.S.C. §3729(a)(1)(A):  False or Fraudulent Claims The Defendant Clinics Caused the Humana Defendants to Present to Medicare Parts C and D**

Relator re-alleges and incorporates the allegations in paragraphs 1-316 as if fully set forth herein.

358.   This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against the Defendant Clinics.

359.   By providing financial and marketing assistance to the Humana Defendants and otherwise aiding and abetting the Humana Defendants' inducement of potential enrollees to

choose Humana Medicare Advantage plans, knowing and foreseeing that the Humana Defendants would present capitation claims for enrollees obtained through violations of the Anti-Kickback Statute and the Anti-Inducement Statute as set forth in Count III above, the Defendant Clinics caused the Humana Defendants to present false or fraudulent claims to Medicare Parts C and D.

360.    Also, by submitting fee-for-service claims tainted by violations of the Anti-Kickback Statute and the Anti-Inducement Statute to the Humana Defendants as contractors of CMS, knowing and foreseeing that the Humana Defendants would present tainted capitation claims for the current year and tainted cost data to CMS for purposes of calculating future-year capitation rates, the Defendant Clinics caused the Humana Defendants to submit false or fraudulent claims to Medicare Parts C & D.

361.    As a result of the presentment of these false or fraudulent claims from and after December 17, 2000, to the present the United States has been damaged and continues to be damaged in an amount yet to be determined.

### Count VII -- 31 U.S.C. §3729(a)(1)(C):  False Claims Act Violations for Conspiracy

Relator re-alleges and incorporates the allegations in paragraphs 1- 316 as if fully set forth

herein.

362.    This claim is for treble damages and penalties under the False Claims Act, 31 U.S.C. § 3729 et seq. against all Defendants.

363.    The Humana Defendants conspired with the Defendant clinics to commit violations of the False Claims Act by presenting claims tainted by illegal inducements offered to Medicare patients in violation of the Anti-Kickback Statute and the Anti-Inducement Statute.

364.    All Defendants performed acts in furtherance of the conspiracy or conspiracies as set forth above.

365.    All Defendants had the requisite intent to defraud.

366.    The United States has been damaged and continues to be damaged in an amount yet to be determined.

**Prayer for Relief**

367.    Relator respectfully requests this Court to enter judgment against all Defendants, as follows:

(a)    That the United States be awarded damages in the amount of three times the damages sustained by the United States because of the false or fraudulent claims alleged within this Complaint, as the Civil False Claims Act, 31 U.S.C. §§ 3729 *et seq.* provides;

(b)    That civil penalties of $11,000 be imposed for each and every false claim that the Defendants presented to the United States;

(c)    That pre- and post-judgment interest be awarded, along with reasonable attorneys' fees, costs, and expenses which the Relator necessarily incurred in bringing and pressing this case;

(d)    That the Court grant permanent injunctive relief to prevent any recurrence of violations of the False Claims Act for which redress is sought in this Complaint;

(e)    That the Relator be awarded the maximum percentage of any recovery allowed to him pursuant the False Claims Act, 31 U.S.C. §3730(d)(1),(2);

(f)    That this Court award such other and further relief as it deems proper

368.    Relator hereby demands a trial by jury.


Respectfully Submitted,
/s/ *Jonathan Kroner*
_____
Jonathan Kroner
Florida Bar 328677
Jonathan Kroner Law Office
420 Lincoln Rd., Suite 248
Miami Beach, FL 33139
305.310.6046
JK@FloridaFalseClaim.com
Attorney for Plaintiff-Relator

**Exhibit List**

Ex A1 CAC massage lunch transportation brochure.pdf

Ex A2 CAC Facility Information lunch, massage, salon, transportation.pdf

Ex A3 CAC Transportation Brochure.pdf

Ex A4 CAC Transportation Services 30000 trips per month.pdf

Ex A5 Careplus CAC Pasteur Transportation disclosed to Government.pdf

Ex A6 CAC-Florida Medical Centers - Wellness and Activities Centers  lunch served daily.pdf

Ex B1 Pasteur beauty salons and over 100 buses unlimited transportation.pdf

Ex B2 Pasteur beauty salons and buses -Spanish.pdf

Ex B3 Pasteur Postcard Beauty Salon.pdf

Ex B4 Pasteur transportation to club.pdf

Ex C1 MCCI  Dec '10 Calendar 8th Street massage.pdf

Ex C2 MCCI Calendar  Dec Hialeah massage.pdf

Ex C3 MCCI July 11 cal Allapatah massage.pdf

Ex C4 MCCI  brochure 'courtesy transportation'.pdf

Ex C5  MCCI website transportation.pdf

Ex D1 Humana Inc - 10-Q - For 9_30_05

Ex D2 MCCI Humana IPA Orlando Agreement.pdf

Ex E1 CarePlus Certification Jan 2011.pdf

Ex F1 Claim Form CMS 1500.pdf

Ex F2 Claim Form CMS 1450 (UB 92).pdf

Ex F3 CMS Form 855b -- Clinic Enrollment.pdf

Ex G1  Humana sign on MCCI

Ex G2  Humana-MCCI Signage

Ex G3 Another Saturday of Fun at Pasteur

Ex G4 Holidays at Hialeah Center