**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**CASE NO.: 10-24486-cv-SCOLA**

UNITED STATES OF AMERICA
*ex rel.* MARC OSHEROFF, *et al.*,

    Plaintiff-Relator,
vs.

HUMANA, INC., *et al.*,

    Defendants.
_____/

**ORDER ON CERTAIN DEFENDANTS' MOTIONS**
**TO DISMISS THE FIRST AMENDED COMPLAINT**

THIS MATTER is before the Court on Defendants' motions to dismiss the First Amended Complaint [ECF Nos. 67, 69, 71], filed February 27, 2012.  Defendants argue that the claims alleged in the Amended Complaint, brought pursuant to the *qui tam* provisions of the False Claims Act ("FCA"), 31 U.S.C. § 3729 *et seq.*, are (1) barred by the "Public Disclosure Bar" of the FCA, 31 U.S.C. § 3730(e), and (2) do not satisfy the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  The Court has carefully reviewed the applicable law and the parties' submissions, and has heard oral argument on the issues raised therein.  For the reasons that follow, the Court finds that Relator's claims are barred under the FCA, and, as such, does not consider Defendants' alternate arguments under Rule 9(b).  This case is dismissed with prejudice as to Humana, Inc. and its affiliated companies, as well as to Pasteur Medical Centers, Inc. ("Pasteur"), which joins in Humana's motion [ECF No. 71].  Pasteur's individual motion to dismiss [ECF No. 69] is denied as moot.  MCCI Group Holding, LLC's ("MCCI['s]") motion to dismiss [ECF No. 67] is denied, in light of the settlement.[1]

---

[1] MCCI has indicated [ECF No. 108] that all claims against it have been settled, subject to approval from the United States Attorney General.  The Relator notified [ECF No. 123] the Court in August that the Department of Justice has given preliminary approval to the terms of the agreement, and the parties are now awaiting final approval.  At oral argument, counsel for Relator indicated that such approval is forthcoming.  Should the settlement fail, MCCI may move to renew the motion to dismiss.

## I. BACKGROUND

This case is one of two health care related *qui tam* actions brought by Relator, Marc Osheroff, currently pending in this District. *See United States ex rel Osheroff v. Tenet Healthcare Corporation, et al.*, No. 1:09-22253-cv-HUCK (S.D. Fla.) (Huck, J.). Mr. Osheroff is also the Relator in at least one other federal action in the Middle District of Tennessee. *See United States ex rel Osheroff v. HealthSpring, Inc.*, No. 3:10-cv-01015 (M.D. Tenn.) (Sharp, J.). All three actions allege violations of the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, among other related statutory provisions, and all are premised on some variation of the "implied certification" theory of FCA liability. Under this theory, since compliance with federal anti-kickback laws is a known prerequisite to reimbursement under the Medicare program, the submission of a request for reimbursement by a party who knows he is in violation of such laws is deemed a "false claim" for purposes of the Act. *See McNutt ex rel. United States v. Haleyville Med. Supplies, Inc.*, 423 F.3d 1256, 1259 (11th Cir. 2005).

Relator alleges that Defendants conspired to defraud the federal government by submitting claims for reimbursement from Medicare that were "tainted" by violations of the Anti-Kickback Statute and its civil counterpart, the Civil Monetary Penalties Law ("CMPL"), 42 U.S.C. § 1320a-7a. The details of these allegations, as well as the statutory framework upon which Relator's claims are based, are described below.

### A. The Parties

The Defendants in this action fall into two groups. The first group, MCCI, Pasteur, and CAC-Florida Medical Centers, LLC ("CAC-Florida")[2] (collectively, the "Clinics"), is comprised of owners and operators of "Cuban-style" medical clinics in Miami-Dade County.[3] The distinguishing feature of these clinics is that they offer "wellness" programs and social activities in addition to standard primary and specialty medical care. As part of these services, the Clinics provide their patients with free "unlimited" transportation, meals, massages, salon services, and entertainment.

The second group of defendants is comprised of Humana, Inc., Humana Health Insurance Company of Florida, Inc., Humana Medical Plan, Inc., and CarePlus Health Plans, Inc.

---

[2] According to the Amended Complaint, CAC-Florida is a subsidiary of Humana, Inc.

[3] According to Defendants, these centers are modeled after neighborhood clinics that once thrived in pre-Castro Cuba, and embody a "holistic" approach to medical care.

(collectively, the "Humana Defendants")[4]—all health insurance companies that provide "Medicare Advantage" health plans to the Clinics' patients. As Medicare Advantage providers, the Humana Defendants are paid a fixed amount by Medicare on a monthly, per-patient basis (as opposed to a fee-for-service basis), pursuant to the terms of their agreement with the Centers for Medicare and Medicaid Services ("CMS"), the federal agency charged with administering the federal Medicare program. The Humana Defendants, in turn, pay the Clinics a contractually-agreed amount based upon the number of patients enrolled in their programs.

Relator is a self-described entrepreneur who owns several medical office buildings in Miami-Dade County, and who claims to have an interest in opening medical clinics that would compete with the Defendant Clinics. Relator has never been employed by Defendants. Nor does he allege that he ever conducted business with Defendants. What he knows about Defendants' business practices, rather, stems solely from his own independent "market research" and informal interviews he claims to have conducted with "dozens" of individuals allegedly familiar with the South Florida health care industry.

### B. Relator's Allegations

At bottom, Relator alleges that Defendants conspired to induce patients to enroll in Medicare Advantage Plans (plans under which the Clinics and the Humana Defendants share in profits) by offering them improper benefits in violation of federal anti-kickback and anti-inducement laws. For each general category of alleged inducements—transportation, meals, massages, and salon services—Relator maintains that such services were provided to the Clinics' patients free of charge and that all Defendants were aware of, and/or approved of, the provision of these free services. Relator further alleges that Defendants, while knowing that the mere offering of these free services violated federal health care laws, and knowing that compliance with such laws is a condition of payment under Medicare, nonetheless sought and received payment for these supposed illegally-obtained enrollments.

Additionally, Relator alleges that his "investigation" revealed a number of additional facts that, if proven, would exclude Defendants' activities from the various "safe harbors" in the federal healthcare laws. The AKS provides that the prohibitions of the AKS shall not apply to "any payment practice specified by the Secretary [of Health and Human Services ("HHS")] in regulations promulgated pursuant to section 14(a) of the Medicare and Medicaid Patient and

---

[4] According to the Amended Complaint, CarePlus Health Plans is a subsidiary of Humana, Inc.

Program Protection Act of 1987 or in regulations under section 1395w-104(e)(6) of this title." 42 U.S.C. § 1320a-7b(b)(3)(E). Acting pursuant to this authority, the Secretary, through the HHS Office of Inspector General ("OIG") and CMS, has created (or has offered guidance with respect to) a number of regulatory safe harbors that Relator claims are applicable to this case.[5] Most notably, the OIG has interpreted the prohibition against the offering of remuneration to prospective Medicare enrollees, discussed below, as not applying to inexpensive gifts or services (i.e. gifts of "nominal value") that have a value of $10 individually or $50 in the aggregate annually, per patient. *See* OIG Special Advisory Bulletin, *Offering Gifts and Other Inducements to Beneficiaries* (August 2002) [ECF No: 84:9]. Second, health care plans, such as those offered by the Humana Defendants, are in some circumstances permitted to offer "additional coverage" or "supplemental benefits." *See* 42 C.F.R. § 1001.952(l) ("'[R]emuneration does not include the additional coverage of any item or service offered by a health plan . . . ."); Medicare Managed Care Manual, Chapter 4, section 30.1. CMS has defined "supplemental benefit" to include only benefits that are "primarily health related"—that is, the "primary purpose of the item or service is to prevent, cure or diminish an illness or injury that is actually present or expected to occur in the future. If the primary purpose of the item or service is comfort, cosmetic, or daily maintenance then it may not be classified as a health benefit." Medicare Managed Care Manual, Chapter 4, section 30.1.[6]

Specifically, Relator alleges that the services offered by the Clinics and promoted by the Humana Defendants are offered without regard to their patients' medical or financial needs, without regard to whether they have medical appointments, and in a manner that exceeds "nominal value." For example, Relator claims that the Clinics' "free unlimited transportation" services are in fact "limousine-class" services that have been used to shuttle patients to malls, casinos, and other "field trips" unrelated to medical appointments, and to pick up patients from locations as far away as the Florida Keys. Regarding the Clinics' free daily meals, Relator

---

[5] Defendants dispute Relator's characterization of the applicable safe harbors. As the scope and applicability of the safe harbors is not presently before the Court, however, this issue will not be addressed. The Court assumes, for purposes of the parties' motions to dismiss, that the results of Relator's investigation would be material to determining whether any safe harbors apply.

[6] In general, any safe harbors applicable to violations of the AKS are also applicable to violations of the CMPL. *See* 42 U.S.C. §1320a-7a(i)(6) ("The term 'remuneration' does not include . . . (B) subject to subjection (n) of this section, any permissible practice described in any subparagraph of section 1230a-7b(b)(3) of this title or in regulations issued by the Secretary.")

claims that they are available at any time, even to go, and even when patients are not scheduled to see a physician.  Lastly, he maintains that the Clinics' free massages and salon services (e.g., haircuts, pedicures, and manicures) are similarly unrelated to the medical needs of their patients.

Based on these facts, Relator alleges that Defendants: (1) knowingly presented, or caused to be presented, a false or fraudulent claim for payment or approval, in violation of 31 U.S.C. § 3729(a)(1)(A) (Counts I, III, V, and VI); (2) knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim, in violation of 31 U.S.C. § 3729(a)(1)(B) (Counts II and IV); and (3) conspired to commit the foregoing acts in violation of 31 U.S.C. § 3729(a)(1)(C) (Count VII).

### C. The FCA's Public Disclosure Bar

The purpose and history of the FCA is well documented.  *See, e.g.*, *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1497 (11th Cir. 1997).  In general, the aim of the law, and in particular its *qui tam* provision, is to enlist the aid of private parties in identifying and eliminating fraud perpetrated against the Government.  *United States ex rel. Williams v. NEC Corp.*, 931 F.2d 1493, 1497 (11th Cir. 1992).  To this end, the Act imposes liability upon anyone who "knowingly presents, or causes to be presented [to the Government] a false or fraudulent claim for payment or approval[.]"   31 U.S.C. § 3729(a)(1)(A).  Similarly, the Act imposes liability upon anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim[.]" *Id*. at § 3729(a)(1)(B).[7]  Private persons known as "relators" may maintain an action to enforce these provisions provided that they first serve a copy of the complaint upon the Government, under seal.  *Id.* at § 3730(b).  Once a relator has initiated the action, the Government may elect to intervene and proceed in the name of the United States or permit the relator to maintain the action on his or her own.  *Id*.  In either case, the incentive for *qui tam* plaintiffs is considerable: if successful, he or she is entitled to between 15 and 30 percent of the proceeds of the action or settlement, depending on whether the Government elects to intervene.  *Id*. at § 3730.

Congress has also recognized, however, that the Act's goals are poorly served by opportunistic, "parasitic" lawsuits by late-comers who may have heard of the fraud but played no part in exposing it.  *See Cooper v. Blue Cross and Blue Shield of Florida*, 19 F.3d 562, 565 (11th Cir. 1994) (citing *False Claims Act Implementation: Hearing Before the Subcomm. on Admin.*

---

[7] The Act also prohibits conspiracy to commit either of the foregoing statutory violations.  *Id*. at § 3729(a)(1)(C).

*Law and Gov. Relations of the House Comm. on the Judiciary*, 101st Cong., 2d Sess. 3 (1990)). The FCA thus contains various jurisdictional and other restrictions limiting who can bring a *qui tam* suit—the most litigated of these restrictions being the "public disclosure bar," which functions to deprive courts of jurisdiction in certain enumerated instances. The current version of section 3730(e)(4)(A) of the Act provides:

> The court shall dismiss an action or claim under this section, unless opposed by the Government, if substantially the same allegations or transactions as alleged in the action or claim were publicly disclosed—
>
> > (i) in a Federal criminal, civil, or administrative hearing in which the Government or its agent is a party;
> >
> > (ii) in a congressional, Government Accountability Office, or other Federal report, hearing, audit, or investigation; or
> >
> > (iii) from the news media,
>
> unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.[8]

The Eleventh Circuit has distilled this framework into a concise, three part test to determine whether jurisdiction exists: "(1) have the allegations made by the plaintiff been publicly disclosed; (2) if so, is the disclosed information the basis of the plaintiff's suit; (3) if yes, is the plaintiff an 'original source' of that information." *Cooper*, 19 F.3d at 565 n.4.[9]

---

[8] Section 3730(e)(4) was amended in 2010, prior to the filing of this lawsuit. *See* PPACA, P.L. 111–148, Title X, Subtitle A, § 10104(j)(2), 124 Stat. 901 (Mar. 23, 2010). The previous version of the statute provided:

> No court shall have jurisdiction over an action based upon the public disclosure of allegations or transactions in a criminal, civil, or administrative hearing, in a congressional, administrative, or Government Accounting Office Report, hearing, audit, or investigation, or from the news media, unless the action is brought by the Attorney General or the person bringing the action is an original source of the information.

*Id*. As discussed below, because the 2010 amendments do not apply retroactively, *see Graham Cnty. Soil & Water Conservation Dist. v. United States ex rel Wilson*, 130 S. Ct. 1396, 1400 n.1 (2010), the previous version of the statute will apply to any alleged false claims made before March 23, 2010, and the amended version to any false claims made thereafter. Relator alleges that fraudulent conduct took place both before and after the amendments. The implications of these amendments, and the different standards that apply, are discussed below.

[9] For purposes of the public disclosure bar, the amended statute substitutes the language "substantially the same" for "based upon." The Eleventh Circuit has yet to analyze the effect of this change. Defendants maintain that Congress intended the amendment merely to resolve a split of authority among the circuits as to whether "based upon" means

## II. LEGAL STANDARD

Historically, the Eleventh Circuit has treated the public disclosure bar as a jurisdictional threshold. As noted below, however, the FCA was amended in 2010 and the language, "[n]o court shall have jurisdiction," was replaced with, "[t]he court shall dismiss an action or claim under this section, *unless opposed by the Government* . . . ." *See* Patient Protection and Affordable Care Act ("PPACA"), P.L. 111–148, Title X, Subtitle A, § 10104(j)(2), 124 Stat. 901 (Mar. 23, 2010) (emphasis added). Nonetheless, because this jurisdictional threshold must be resolved preliminarily, the Court's analysis, as a practical matter, remains the same.

Accordingly, a motion to dismiss pursuant to the public disclosure bar can come in two forms: "facial" attacks on the Court's authority to proceed, which claim that the plaintiff has failed to sufficiently allege a basis for the court's continuing jurisdiction, and "factual" attacks, which challenge jurisdiction in fact, irrespective of the pleadings, and require the Court to consider and weigh the evidence submitted by the parties on the issue. *Morrison v. Amway Corp.*, 323 F.3d 920, 925 n.5 (11th Cir. 2003). In the case of factual attacks, "[t]he existence of disputed material facts does not prevent the trial court from evaluating for itself the merits of the jurisdictional claim," *Principal Life Ins. Co. v. Alvarez*, 2011 WL 4102327, at *2 (S.D. Fla. Sept. 14, 2011) (Altonaga, J.), and the burden is "on the plaintiff to prove that jurisdiction exists," *OSI, Inc. v. United States*, 285 F.3d 947, 951 (11th Cir. 2002) (citations omitted).

Here, Defendants challenge the Court's authority to proceed as a matter of fact, relying on various documents attached to their motions to dismiss, as well as several exhibits attached to the Amended Complaint. There is no dispute as to the authenticity of these materials.

---

"supported by" or "substantially similar to," as the majority of courts (including the Eleventh Circuit) have held, or "derived from," as held by the Fourth and Seventh Circuits. *Compare Cooper*, 19 F.3d at 567 ("supported by") *with United States ex rel. Siller v. Becton Dickinson & Co. By and Through Microbiology Systems Div.*, 21 F.3d 1339, 1349 (4th Cir. 1994) (acknowledging split of authority and concluding that "based upon" means "actually derived" from). *See also* John T. Bose, *Civil False Claims and* Qui Tam *Actions* § 4.02[C] (4th Ed. 2012). Accordingly, Defendants maintain that the 2010 amendments adopt the majority position, leaving unchanged the Eleventh Circuit's analysis announced in *Cooper* and elsewhere. *See United States ex rel. Black v. Health & Hosp. Corp. of Marion County*, 2011 WL 1161737, at *6 (D. Md. 2011). Relator, on the other hand, claims that the amendment narrowed the application of the public disclosure bar, effectively rejecting those decisions holding that the bar precludes suits based only in part on publicly disclosed information. *See United States ex rel. Sanchez v. Abuarbara*, 2012 WL 1999527, at *3 (S.D. Fla. 2012) (Huck, J.). As detailed below, the Court declines to address this issue at this time, since it finds Relator's post-amendment claims barred even under a more narrow interpretation of the amendments. For convenience, the Court will continue to analyze the issue under the general structure of *Cooper's* three-part test.

### III. ANALYSIS

#### A. Have Allegations Made by Plaintiff Been Publicly Disclosed?

##### 1. Alleged Disclosures

Defendants direct the Court to dozens of public disclosures that, in their view, disclose information that is substantially the same as the allegations and transactions described in the Amended Complaint. These documents fall into three general categories: (1) articles and advertisements published in the *Miami Herald*; (2) Defendants' websites and print brochures; and (3) Florida state court litigation documents in *Wellcare of Florida, Inc. v. Pasteur Medical Center, Inc., et al.*, Case No. 05-24450 (Fla. Cir. Ct.) (the "*Wellcare* litigation").[10] Within each category, the nature and scope of the individual disclosures varies.

Regarding the first category, Defendants argue that the activities underlying Relator's claims were fully disclosed in a series of feature articles published in the *Miami Herald*'s "Business Monday" section under the heading, "Upbeat Checkups[,] Cuban-style clinics are a big hit in South Florida. Could they become America's healthcare model for the future?" (March 12, 2007) [ECF No. 73:5] (naming Humana, CAC-Florida, and MCCI, among other Clinics). One article in the feature is titled, "Leon, CAC patients get Ritz-Carlton treatment."[11] The feature describes how "Cuban-style clinics" offer their patients free social activities and meals (coffee, breakfast pastries, and lunch) and note that "[w]ell over half of CAC and Leon clients arrive by van—at no charge." The feature also discloses that "everything is paid for by taxpayer dollars."

Other *Miami Herald* articles and advertisements cited by Defendants also disclose the free services provided by the Clinics, albeit in a more generalized or passing fashion. For example, one article titled, "Diagnosis is confusion as patients flood clinics," notes that CAC-Florida's patients are accustomed to a "wealth of services," including free coffee and transportation. [ECF No. 73:9]. A CarePlus newspaper ad promotes "$0 for free unlimited transportation." [ECF No. 73:15]. The remaining sources make similar disclosures, but either relate to allegations or parties not referenced in the Amended Complaint, or disclose only that these services are offered—not that they are offered free of charge. *See* Miami Herald, *S.*

---

[10] Defendants also cite to an article published in a scholarly journal, but the article has little or no relation to Relator's claims. *See* [ECF No. 73:8].

[11] The article indicates that CAC-Florida is a sister company of CarePlus and is owned by Humana.

*Florida seniors' coverage may be cut* (Nov. 13, 2009) [ECF No. 73:7] (Humana); Miami Herald, *Entrepreneur plans new South Florida HMO* (Sept. 22, 2009) [ECF No. 73:10] (CarePlus, CAC-Florida); Miami Herald, *FIU given $10M gift from healthcare entrepreneur* (May 29, 2008) [ECF No. 73:14] (CAC-Florida).

The second category of disclosures relied upon by Defendants involves representations made on the Clinics' websites, *see* [ECF Nos. 27:1(A-2); 27:2 (B-1, B-2, B-4)] (CAC-Florida, CarePlus, Pasteur),[12] and in print brochures, *see* [ECF No. 27:1 (A-3)] (CAC-Florida, CarePlus), copies of which were obtained by Relator and attached as exhibits to the Amended Complaint. These materials disclose that the Clinics offer "free," "unlimited," and "complimentary" transportation and meals, as well as massage services. Other materials cited by Defendants describe similar services, but again do not indicate that they are available free of charge. *See* [ECF Nos. 27:1 (A-1, A-4, A-5)] (CAC-Florida).

Finally, Defendants maintain that Relator's claims, except those related to conduct that took place after the 2010 amendments,[13] are barred because similar allegations were made during the *Wellcare* litigation. During that lawsuit, and in particular in the Special Master's Report, it was disclosed that Pasteur offered free daily meals, social events, and transportation to patients who were enrolled in CarePlus health plans. *See* [ECF Nos. 73:11, 12, 13]. The Amended Complaint specifically references various allegations in the *Wellcare* litigation.

### 2. Were These Disclosures "Public" for Purposes of the FCA?

As noted above, not all disclosures that might ordinarily be regarded as "public" qualify as public disclosures for purposes of the FCA. Of the three types of disclosures that may trigger the bar, two are implicated here: disclosures made in connection with legal proceedings and

---

[12] Relator argues that these disclosures, which are attached as exhibits to the Amended Complaint, cannot be considered because they were printed by Relator after the filing of the original Complaint, and there is no indication that this information was disclosed at that time. The Court agrees with Defendants that it must review the allegations of the Amended Complaint for purposes of the public disclosure bar. *See Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 472 (2007) ("In our view, the term "allegations" is not limited to the allegations of the original complaint. It includes (at a minimum) the allegations in the original complaint *as amended*.") (emphasis in original).

[13] The 2010 amendments to the FCA modified the public disclosure bar so that only disclosures made in connection with *federal* legal proceedings will trigger the bar. Under the earlier version of the statute, applicable to conduct prior to March 23, 2010, disclosures made in both federal and state proceedings were grounds for dismissal. 31 U.S.C. § 3730(e)(4)(A) (1986), *amended by* PPACA, P.L. 111–148, Title X, Subtitle A, § 10104(j)(2), 124 Stat. 901 (Mar. 23, 2010). As noted above, however, the 2010 amendments do not apply retroactively. *Graham Cnty. Soil & Water Conserv. Dist. v. United States ex rel. Wilson*, 130 S. Ct.1396, 1400 n1 (2010). *See also Hughes Aircraft Co. v. United States ex rel. Schumer*, 520 U.S. 939, 946-57 (1997).

disclosures in the "news media." The Eleventh Circuit has not specifically defined what constitutes "news media," but various district courts have interpreted the term as including disclosures made in newspapers and publicly-accessible websites. *See, e.g.*, *United Stated ex rel. Barber v. Paychex, Inc.*, 2010 WL 2836333, at *8 (S.D. Fla. 2010) (newspaper articles and websites) (King, J.); *United States ex rel. Brown v. Walt Disney World Co.*, 2008 WL 2561975 (M.D. Fla. 2008) (newspapers and websites) (Conway, C.J.), *aff'd* 361 Fed. App'x 66 (11th Cir. 2010). Other courts, too, have found that advertisements in newspapers can qualify as public disclosures under the statute. *See United States ex rel. Colquitt v. Abbott Labs.*, 2012 WL 1081453, at *16 (N.D. Tex. 2012) (Lynn, J.); *United States ex rel. Ondis v. City of Woonsocket, R.I.*, 582 F. Supp. 2d 212, 217 (D.R.I. 2008) (Torres, J.). Such decisions observe that the FCA requires only that the disclosed information be "from the news media." "It does not require that the information appear in any particular form or section of a newspaper." *Woonsocket*, 582 F. Supp. at 217. "A person who picks up a copy of [the *Miami Herald*] has just as much access to the advertisements as the edited content." *Colquitt*, 2012 WL 1081453, at *16. Additionally, two recent Supreme Court decisions have remarked on the "broad scope" of the public disclosure bar, particularly as it relates to the "news media." *See Schindler Elevator Corp. v. U.S. ex rel. Kirk*, __ U.S. __, 131 S. Ct. 1885, 1891 (2011) ("The other sources of public disclosure in § 3730(e)(4)(A), especially 'news media,' suggest that the public disclosure bar provides 'a broa[d] sweep'"); *Graham*, __ U.S. __, 130 S. Ct. at 1404.

With the exception of the Clinics' printed brochures, the Court finds that the remaining documents cited by Defendants are disclosures of the types recognized under the FCA. Subject to the caveat noted above, the parties agree that the *Wellcare* litigation documents are covered under the first category of disclosures under the statute. Relator likewise does not dispute that the articles and advertisements published in the *Miami Herald* lie squarely within the statute's application to "news media," and that the Clinics' websites, which are specifically intended to promote their services to the public, should be similarly covered. As for the brochures, the Court agrees with Relator that these materials, available only at the Clinics' physical locations, do not qualify as "public" disclosures merely because the same information is available elsewhere in the public domain.

The crux of Relator's argument, however, is not that these sources are outside of the FCA, but rather, that the disclosures made therein do not amount to "allegations or transactions"

as this term is used in the statute. Specifically, Relator argues that, to trigger the bar, the disclosures must reveal Defendants' participation in the alleged fraud with the same specificity as would be required pursuant to Rule 9(b) of the Federal Rules of Civil Procedure; generalized, "innocuous" information about the subject matter of the suits, he maintains, will not suffice. To permit such an inference in this case, he continues, the publicly disclosed allegations or transactions must show not only that Defendants provided their patients with free transportation, food, and salon services, but *also* that the circumstances under which these benefits were offered were such that Defendants' conduct is not protected by any of the safe harbors in the federal anti-kickback or anti-inducement laws.

The Eleventh Circuit has not established a specific test for determining whether "allegations or transactions" have been disclosed. Urging the Court to construe this requirement narrowly, Relator relies principally on the Eleventh Circuit's decision in *Cooper v. Blue Cross and Blue Shield of Florida, Inc.*, wherein the court found that certain disclosures did not constitute a public disclosure of allegations or transactions because they did not allege that the defendant "actually engaged in wrongdoing." 19 F.3d 562, 567 (11th Cir. 1994). Relator also relies on a recent decision issued by Judge Huck in *Tenet* observing that "an action alleging a fraud that is hidden in plain sight should [not] be barred simply because it is hidden in public disclosure." Case No. 09-22254 [ECF No. 111]. Advancing a broader interpretation, Defendants respond that the Eleventh Circuit regularly uses the term "allegations or transactions" interchangeably with the term, "information," which arguably suggests that a less rigid approach is appropriate. *See, e.g.*, *United States ex rel. Lewis v. Walker*, 438 Fed. App'x 885, 887 (11th Cir. 2011). Defendants also contrast the *Tenet* decision with Judge King's decision in *Barber*, concluding that the public disclosure bar applies where "the factual *information underlying the claims* is already available in the public domain . . . ." 2010 WL 2836333, at *9 (emphasis added). "[T]hat a relator may have been the first to attach legal wrongdoing to these underlying facts," Judge King observes, "is simply of no moment." *Id.* (quoting *A-1 Ambulance Serv., Inc. v. California*, 202 F.3d 1238, 1245 (9th Cir. 2000)) (internal quotations omitted).

Upon careful review, the Court finds less tension between these decisions than is suggested by the parties. In *Cooper*, for example, the Eleventh Circuit did not hold that the public disclosure bar requires, *in every case*, specific allegations of wrongdoing. *See Cooper*, 19 F.3d at 567. The Eleventh Circuit merely held that one of the many disclosures relied upon by

the defendant, a Government Accountability Office report, did not allege that the defendant actually engaged in wrongdoing "*in its capacity as a primary insurer*" (the capacity in which it was acting when it allegedly defrauded the government). 19 F.3d at 567. In other words, the public disclosure bar does not apply to publicly disclosed allegations of wrongdoing that are unrelated to the allegations of the relator's complaint. Similarly, Judge Huck's opinion, which addresses "fraud that is hidden in plain sight," does not purport to remove from the purview of the public disclosure bar those instances where the allegations or transactions disclosed in the public domain, while not describing with particularly the specific fraud alleged in the complaint, are otherwise sufficient to alert the Government to the likelihood of fraud in the manner alleged by the relator. The cases cited by Defendants are in accord with this reasoning.[14] Moreover, this approach is in line with the FCA's dual purposes of enlisting whistleblowers toward the goal of preventing fraud and preventing parasitic suits that the government could have brought on its own.

Applying this standard to the instant case, the Court finds that the disclosures concerning Defendants' business practices in the *Miami Herald*, on the Clinics' websites, and in the *Wellcare* litigation were disclosures of "allegations" or "transactions" for purposes of the statute. The AKS makes it a federal crime to knowingly and willingly offer *any* remuneration (including any kickback, bribe, or rebate) to any person for the purpose of inducing that person to purchase any good or service for which payment may be made in whole or in part under a federal health program. 42 U.S.C. § 1320a-7b(b)(2). Similarly, the CMPL provides for civil penalties against those who offer to or transfer remuneration to individuals eligible for benefits under Medicare, knowing that such remuneration is likely to influence their decision to order or receive from a particular provider, practitioner, or supplier any item or service for which payment may be made under Medicare. 42 U.S.C. § 1320a-7a(a)(5). The parties do not appear to dispute that the benefits and services offered by the Clinics, described above, qualify as "remuneration" under these statutes. *See generally* OIG Advisory Opinion 09-01 (March 6, 2009); OIG Advisory Opinion No. 00-7 (November 17, 2000). And since the AKS and the CMPL are implicated upon the mere *offering* of *any* remuneration, it follows that the public disclosures cited by Defendants—which reveal that Defendants offer existing and prospective Medicare recipients

---

[14] As an aside, the Court draws no inferences from the Eleventh Circuit's occasional use of the term "information" in lieu of the statutory language, "allegations or transactions." The use of one term over another appears a choice of style, rather than substance.

*free unlimited* transportation, *free* food, and *free* salon services—were sufficient to bring the Defendants' alleged fraud to the Government's attention.

Continuing with this reasoning, the Court is not persuaded by Relator's argument that, because the AKS and the CMPL each have knowledge requirements, the public disclosure bar only applies if the information disclosed reveals that Defendants knew that their conduct was not protected under any applicable safe harbors. To begin with, the principal case cited by Relator merely holds that, to survive a motion to dismiss an FCA claim based on violations of the anti-kickback laws, the relator must allege sufficient facts to "support an *inference* or *render plausible* that [the defendant] acted while knowing that its [conduct] fell outside the Safe Harbor Provision on which it was entitled to rely." *See United States v. Corinthian* Colleges, 655 F.3d 984, 997 (9th Cir. 2011). *See also United States ex rel. Oliver v. Parsons Co.*, 195 F.3d 457, 464 (9th Cir. 1999). Therefore, even if the Court were to accept Relator's claim that the public disclosure must be as specific as the *qui tam* complaint itself (which it does not), the Court finds that the information disclosed here would indeed be sufficient to satisfy this modest pleading standard. Whether Relator could ultimately prevail on these facts alone in light of Defendants' likely affirmative defenses is, of course, another matter altogether.

Furthermore, regarding the AKS, the Eleventh Circuit does not appear to interpret the knowledge requirement—knowing and *willful*—as requiring the plaintiff to prove that the defendant knew that his conduct violated the statute (or, likewise, that he knew the safe harbors did not apply), since such a conclusion would run afoul of the traditional rule that ignorance of the law is not a defense. Instead, the Eleventh Circuit has held that the defendant does not need to know the specific law that his conduct may be violating, but must act only with the intent to do something that the law forbids. *United States v. Starks*, 157 F.3d 833, 838-39 (11th Cir. 1998). For purposes of the knowledge requirement, therefore, a defendant could be found to have committed a "knowing and willful" violation of the statute despite having no understanding of the applicability, *vel non*, of the statutory safe harbors. The Court will not require a greater factual showing in the context of the public disclosure bar than it would require of Relator's complaint.

Along these same lines, for *qui tam* actions based upon CMPL violations (assuming such a cause of action exists),[15] the Court cannot conclude that the public disclosure bar requires disclosure of facts upon which the Government could infer a *knowing* violation of the statute. The knowledge requirement of the CMPL does not pertain to Defendants' knowledge of the wrongfulness of their conduct, but, rather, their knowledge of the impact of their conduct on prospective Medicare enrollees. *See* 42 U.S.C. § 1320a-7a(a)(5) (prohibiting offers of remuneration to persons that the defendant "knows or should know *is likely to influence such individual* . . . .").

At bottom, the safe harbors provide Defendants with an affirmative defense, and their alleged inapplicability to the case at bar is not an element of Relator's claim. Relator's arguments misunderstand the nature of the safe harbor provisions. The inapplicability of a safe harbor does not, by itself, make the alleged conduct illegal. As the OIG has observed:

> Legally and logically, the safe harbors can only make the zone of illegal conduct smaller. . . . If a practice or arrangement does not fall within a safe harbor, it has precisely the same legal risk that it had before the safe harbor was promulgated. The safe harbors are designed to provide a means through which plans and providers can be assured that their arrangements are immune from potential criminal and administrative sanctions under the anti-kickback statute.

61 Fed. Reg. 2122, 2124 (Jan 25, 1996). This being so, the Court concludes that the materials relied upon by Defendants disclose all of the allegations and transactions necessary to bring this case within the reach of the public disclosure bar.

### B. Is Relator's Complaint "Based Upon" or "Substantially the Same" as the Publicly Disclosed Allegations or Transactions?

Under the framework established in *Cooper*, once the Court has determined that allegations made by the relator have been publicly disclosed, the next step is to determine whether such allegations are the basis of the relator's complaint. In making this determination, the Eleventh Circuit has emphasized that the public disclosure bar "precludes suits based in *any part* on publicly disclosed information." *See Cooper*, 19 F.3d at 567 (emphasis added); *see also*

---

[15] Defendants argue that CMPL violations cannot be the basis of an FCA suit under the false certification theory. *See United States ex rel. Grayson v. Genoa Healthcare*, No. C09-506Z, 2011 WL 2670079, at *5 (W.D. Wash. July 6, 2011); *United States ex rel. Gonzalez v. Fresnius Med. Care N. Am.,* 2010 WL 1645969, at *8 (W.D. Tex. Jan. 21, 2010). This issue need not be addressed by the Court at this time.

*United States ex rel. Brown v. Walt Disney Co.*, 361 Fed. App'x 66, 68 (11th Cir. 2010) (citing *Battle v. Board of Regents*, 468 F.3d 755, 762 (11th Cir. 2006)). For conduct that occurred after March 23, 2010, the Court must inquire whether "substantially the same" allegations alleged in Relator's Amended Complaint were publicly disclosed. As this case does not present a close call on this issue, the Court will not labor unnecessarily to draw narrow distinctions, to the extent there are any, between these standards.

Relator argues that his claims are not "based upon" or "substantially similar" to the above-described public disclosures because the allegations and transactions upon which the Amended Complaint is premised—those which he personally uncovered as a result of his investigation—would, if proven, remove Defendants' conduct from the protection of any applicable safe harbors. The allegations and transactions that were publicly disclosed, Relator maintains, are by themselves "innocuous."

The Court disagrees. Even if "innocuous" disclosures cannot serve as the basis of one's claims under the FCA, the allegations and transactions publicly disclosed in this case were nothing of the sort. As discussed above, the crucial element in any claim under the AKS or the CMPL is the *offering* of an inducement. The disclosures cited above clearly disclose that Defendants *offered* benefits—namely, transportation, meals, and salon services—other than those that one would normally associate with the provision of medical services. They also disclose that such benefits were "free," "complimentary," "$0," and, in the case of CarePlus's transportation services, "unlimited." And they revealed that these benefits were available to enrollees in Humana's (taxpayer-subsidized) Medicare health plans. These allegations and transactions are central to, and incorporated by reference into, each of the seven counts of the Amended Complaint.

If anything, it is Relator's allegations that are by and large "innocuous." For example, Relator describes in excruciating detail what meals are offered on what days at the Clinics' facilities—along with the cost of comparative meals at nearby local restaurants (including tip), and the name, address, and in some cases phone numbers of the individuals who provided Relator with such information. Similarly, he alleges that he "studied" the Clinics' free transportation services and observed that their "limo-class vehicles contained two or fewer passengers even though the vehicles seat 8, 10 or more." He includes a table showing how many total trips he witnessed and how many of these trips carried fewer than two or three passengers.

These allegations, while potentially material to Defendants' *anticipated* affirmative defenses, are not essential to relator's *claims*. At this stage, the allegations and transactions uncovered by Relator's investigation, which he claims were not publicly disclosed, merely add to the allegations that were already in the public domain. In light of the purposes of the Act and the broad interpretation that the Eleventh Circuit has historically given to the public disclosure bar, the Court concludes that Relator's claims are "based upon" and "substantially the same" as the allegations and transactions that were previously disclosed.

### C. Is Relator an "Original Source"?

Even when the public disclosure bar applies, however, Relator may still bring a *qui tam* action if he qualifies as an "original source" under 31 U.S.C. § 3730(e)(4)(B). Under the pre-2010 statute, an "original source" is defined as follows:

> "[O]riginal source" means an individual who has direct and independent knowledge of the information on which the allegations are based and has voluntarily provided the information to the Government before filing an action under this section which is based on the information.

31 U.S.C. § 3730(e)(4)(B) (1986), *amended by* PPACA, P.L. 111–148, Title X, Subtitle A, § 10104(j)(2), 124 Stat. 901 (Mar. 23, 2010). The amended version now provides:

> "[O]riginal source" means an individual who either (i) prior to a public disclosure under section (e)(4)(A), has voluntarily disclosed to the Government the information on which allegations or transactions in a claim are based, or (ii) who has knowledge that is independent of and materially adds to the publicly disclosed allegations or transactions, and who has voluntarily provided the information to the Government before filing an action under this section.

31 U.S.C. § 3730(e)(4)(B) (2010).

Here again, Relator's arguments are unavailing under both the pre-2010 and post-2010 versions of the FCA. Under the earlier, narrower original source exception, Relator fails to qualify as an original source because he does not have direct and independent knowledge of the information *on which his allegations are based*. As noted above, Relator's claims are based upon the Defendants' alleged offering of (or causing to offer) remuneration—in the form of free transportation, free food, and free salon services—to individuals enrolled in or eligible for

Medicare.[16]  They are not based upon allegations or transactions that are material only insofar as, if proven, they could potentially defeat Defendants' affirmative defenses under the safe harbor provisions of the AKS and the CMPL.  The fact that violations of these statutes must be "knowing" or "willfully" does not change this analysis.

Under the amended statute, Relator fails to persuade the Court that the allegations about which he claims to have independent knowledge materially add to the information already in the public domain.  Standing alone, facts such as the value of the meals provided by the Clinics to their patients, or the number of passengers who use the Clinics' vans, whether to a physician appointment or anywhere else, cannot form the basis of a claim under the AKS or the CMPL (or, in turn, the FCA, under a false certification claim).  The relevance of this information is necessarily *dependent upon* the fact that these services were offered to Medicare enrollees and the fact that they were free.  Thus, while the information revealed in Relator's investigation may prove critical to overcoming Defendants' affirmative defenses, it is not necessary to alert the Government to fraud that otherwise would have gone unnoticed.  This, after all, is the purpose of the *qui tam* provisions.  Accordingly, 31 U.S.C. § 3730(e)(4) requires this action to be dismissed.

### IV. CONCLUSION

For the foregoing reasons, it is here by **ORDERED** and **ADJUDGED** that:

1. The Humana Defendants' and CAC-Florida's Motion to Dismiss [ECF No. 71], adopted by Pasteur [ECF No. 76], is hereby **GRANTED.**
2. Pasteur's Motion to Dismiss [ECF No. 69] is **DENIED AS MOOT**.
3. This case is **DISMISSED WITH PREJUDICE** as to the Humana Defendants, CAC-Florida, and Pasteur.
4. MCCI's Motion to Dismiss [ECF No. 67] is **DENIED**, in light of the settlement.  If the settlement fails, MCCI may move to renew its motion.  Relator shall promptly notify the Court when a final settlement is approved.  In the interim, Relator shall file a notice regarding the status of final approval every 30 days, beginning **October 15, 2012**.
5. The Clerk shall administratively **CLOSE** this case.  MCCI and/or Relator may move to re-open the case if there is a problem with final settlement approval.

**DONE** and **ORDERED** in chambers at Miami, Florida on September 28, 2012.

*Copies to:* Counsel of Record

ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT JUDGE

---

[16] Relator does not claim to be an original source of this information.