## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 10-24486-cv-SCOLA

UNITED STATES OF AMERICA
*ex rel.* MARC OSHEROFF,

      Plaintiff-Relator,

v.

MCCI GROUP HOLDINGS, LLC,

      Defendant.

_____/

### ORDER GRANTING IN PART RELATOR'S MOTION TO ENFORCE SETTLEMENT AND DECLINING TO ADOPT MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

THIS MATTER is before the Court on the Report and Recommendation [ECF No. 163] regarding Relator's Motion to Enforce Settlement [ECF No. 130], issued by Magistrate Judge Ted E. Bandstra on December 19, 2012. Relator Marc Osheroff (the "Relator") filed objections [ECF No. 167] to the Report and Recommendation, to which Defendant MCCI Group Holdings, LLC ("MCCI") responded [ECF No. 173]. The Government also filed a statement of interest [ECF No. 176], and the Relator filed a reply [ECF No. 183] addressing both MCCI's response and the Government's statement of interest. Upon considering these submissions and other pertinent portions of the record, the Court declines to adopt the Magistrate Judge's Report and Recommendation and finds that the settlement between the Relator and MCCI should be enforced. The Court nevertheless assumes, without deciding, that the Government should have an opportunity to consent to dismissal based on the settlement. If the Government does not consent, the Court will proceed to decide whether such consent is necessary in a declined case.

### Introduction

This case is a *qui tam* action brought by the Relator against various healthcare entities, including MCCI, pursuant to the False Claims Act, 31 U.S.C. § 3729 *et seq.* On September 28, 2012, the Court awarded dismissal to the other Defendants, finding that the Relator's claims

were barred under the statute.  Meanwhile, MCCI's request for dismissal was denied as moot because the Court was told that MCCI and the Relator had settled at mediation on May 24, 2012.

On that date, all the parties participated in mediation with former Department of Justice Attorney Stephen D. Altman.  While the mediation was unsuccessful as to several Defendants, the Relator was able to reach an agreement with MCCI.  The terms of the settlement were set forth in a handwritten "Memo of Understanding," executed by the parties and their counsel, which stated as follows:

MEMO OF UNDERSTANDING

The below parties have agreed to resolve their claims in this action against each other on the following terms:

1. MCCI will pay the United States $1.6 million within 14 days of court approval of the dismissal.

2. MCCI will pay relator's counsel $300,000 in attorney fees and costs within 14 days of dismissal.

3. The parties will execute a settlement agreement that will include mutual releases, and a statement that there is no admission of liability and that the settlement is for economic reasons.

4. Relator reserves all rights against all other defendants.

5. MCCI will not object to any relator share amount up to 30%.

*See* Memo of Understanding [ECF No. 130-1].

On June 8, 2012, both parties filed notices of settlement with the Court, representing that they had reached a "***full settlement***" and would be seeking dismissal upon consent of the Government.  *See* Notices of Settlement [ECF Nos. 107, 108] (emphasis supplied).  Both parties were operating on the assumption that the Government had to approve the settlement pursuant to the False Claims Act, 31 U.S.C. § 3730(b)(1), which provides that such actions "may be dismissed only if the court and Attorney General give written consent to the dismissal and their reasons for consenting."  Thus, the parties submitted the essential terms of their settlement, as set forth in the "Memo of Understanding" to the Department of Justice for Approval.

On August 13, 2012, the Government notified the parties by email of its "consent to the offer of compromise of $1.6 million to resolve Relator's claim against MCCI," with "a 25% Relator share of that amount" going to Osheroff.  *See* Gov't Settlement Approval Email [ECF No. 130-3].  The Government requested that the parties "forward a draft settlement agreement for [its] review," and "suggest[ed] that [they] refer to recent False Claims Act

settlement agreements with the government to ensure that all applicable provisions are included in the agreement." *See id.*   On August 15, 2012, the Relator notified the Court of the Government's preliminary approval. *See* Notice of Preliminary Approval [ECF No. 123].

Subsequently, Relator sent MCCI a draft of a formal settlement agreement, using language from the Government's sample, along with a draft stipulation of dismissal. On September 13, 2012, MCCI returned a redlined version with its suggested revisions, inclusions, and deletions. Specifically, MCCI sought the inclusion of exculpatory language as to its motivations for settlement, and the deletion of several provisions stating that the Government was not releasing it from potential administrative sanctions, tax liabilities, and criminal charges. MCCI also redlined certain provisions barring it from attempting to charge back to the Government any "unallowable costs" stemming from the settlement (the "unallowable costs provision"), and a statement concerning the potential tax treatment of the settlement (the "tax neutrality provision").

Relator accepted MCCI's proposed changes, and was prepared to present them to the Government. While the agreement was apparently never formally presented for the Government's approval, the Government has made clear in its submissions on the motion to enforce that it will not consent to the settlement agreement without the inclusion of the unallowable costs and tax neutrality provisions. No party, including the Government, has indicated that MCCI's proposed changes to the draft would be unacceptable in any other respect.

On September 28, 2012, while the parties were exchanging versions of the final language, this Court entered its order of dismissal as to the other Defendants. On October 1, 2012, the Government emailed the parties, stressing that its consent to the settlement was contingent on review of the final agreement to ensure that certain standard provisions were incorporated therein. That same day, MCCI sent Relator a letter stating that after reading the transcript of oral argument at the dismissal hearing, it was "shocked to see [Relator's] assertions to the Judge." *See* Mot. to Enforce [ECF No. 130-14]. MCCI also unilaterally declared in the letter, without explanation, that "[i]t is evident that we cannot agree on the proper language for a final settlement stipulation and all prior offers are withdrawn." *See id.*   At that time, it appears the draft agreement had not yet been presented to the Government for approval.

In response to MCCI's October 1, 2013 letter, Relator moved to enforce the settlement. Thereafter, this Court referred the matter to the Magistrate Judge for a report and

recommendation.  After a hearing, the Magistrate Judge issued an order recommending denial of Relator's motion.  According to the Magistrate Judge, "a binding settlement agreement between Relator and MCCI was not reached due to the failure to meet the condition precedent that the agreement be approved by the Attorney General."  *See* R&R [ECF No. 163] at 9.

## Legal Standard

The district court may refer a pending motion to a magistrate judge for "proposed findings of fact and recommendations" as to disposition.  *See* 28 U.S.C. § 636(b)(1)(B).  After the magistrate judge issues the proposed findings and recommendations, the parties are given fourteen days to file written objections.  *See* 28 U.S.C. § 636(b)(1).  Whenever any party files such objections, the district court must conduct a *de novo* review of the record with respect to the challenged issues.  *See LoConte v. Dugger*, 847 F.2d 745, 750 (11th Cir. 1988); *see also* 28 U.S.C. § 636(b)(1).  "As the use of the phrase *de novo* implies, the district court's consideration of the [objected-to issue] must be independent and based upon the record before the court."  *LoConte*, 847 F.2d at 750.  After reviewing the record *de novo*, the district court "may accept, reject, or modify the magistrate judge's recommendations."  *See Muhammad v. HSBC Bank USA*, *N.A.*, 399 F. App'x 460, 462 (11th Cir. 2010); *see also* 28 U.S.C. § 636(b)(1).

## Legal Analysis

"The Court has jurisdiction to enforce a settlement agreement when one party refuses to abide by the agreement prior to dismissal of the action."  *BP Prods. N. Am., Inc. v. Oakridge at Winegard, Inc.*, 469 F. Supp. 2d 1128, 1143 (M.D. Fla. 2007); *see also Ford v. Citizens & So. Nat'l Bank, Cartersville*, 928 F.2d 1118, 1121 (11th Cir. 1991) ("Under federal law, a district court has 'inherent power to summarily enforce settlement agreements entered into by parties litigant in a pending case.'").  As a general matter, "settlement agreements are favored by courts and will be enforced where possible."  *See Blunt v. Tripp Scott, P.A.*, 962 So. 2d 987, 988 (Fla. 4th DCA 2007); *see also D.R. by M.R. v. East Brunswick Bd. of Educ.*, 109 F.3d 896, 901 (3d Cir. 1997) ("a decision that would allow [parties] to void settlement agreements when they become unpalatable would work a significant deterrence contrary to the federal policy of encouraging settlement agreements").  Ultimately, the decision to enforce a settlement agreement is committed to the district court's sound discretion.  *See Hayes v. Nat'l Serv. Indus.*, 196 F.3d 1252, 1254 (11th Cir. 1999).

To determine whether a settlement agreement is enforceable, courts look to general contract law principles. *See In re Chira*, 567 F.3d 1307, 1311 (11th Cir. 2009). Ordinarily, state contract law applies to the interpretation and enforceability of settlement agreements, even where the underlying lawsuit arises under federal law. *See Resnick v. Uccello Immobilien GMBH, Inc.*, 227 F.3d 1347, 1350 (11th Cir. 2000); s*ee also  Abbott Labs. v. CVS Pharm., Inc.*, 290 F.3d 854, 857 (7th Cir. 2002) ("interpretation of a settlement contract is governed by state law even if the settled claim arose under federal law"). But this rule has exceptions. For instance, the Eleventh Circuit has recognized that "federal common law principles should be used to interpret a contract involving federal rights or interests," *see U.S. ex rel. Whitten v. Triad Hospital, Inc.*, 210 F. App'x 878, 881 n.5 (11th Cir. 2006), or "where a uniform national rule is necessary to further strong and expressed interests on the part of the federal government," *see Beverly v. Macy*, 702 F.2d 931, 936 (11th Cir. 1983); *see also Clearfield Trust Co. v. United States*, 318 U.S. 363, 366-68 (1943). Thus, federal common law will frequently apply to the interpretation of contracts in "cases involving obligations of the federal government, obligations and rights of private parties created by federal law, or objects and instrumentalities over which the federal government has an overriding interest." *See Beverly*, 702 F.2d at 936.

The Relator and MCCI, as well as the Magistrate Judge, assumed that Florida law, not federal common law, governed the enforceability of the settlement agreement here. Because this case arises under the False Claims Act and implicates federal governmental interests, however, that assumption may well be wrong. Nevertheless, "because the contract interpretation principles applied under [Florida] law and federal law are virtually the same, the outcome of this case will be unaffected by the choice of law." *Whitten*, 210 F. App'x at 880. Indeed, the contract rules that the Court is called upon to apply concern such plain vanilla issues as whether the parties agreed upon all material terms and whether a subsequent disagreement over other boilerplate terms negated their prior understanding – matters on which Florida and federal law do not conflict. *See Eli Lilly & Co. v. Air Exp. Int'l USA, Inc.*, 615 F.3d 1305, 1314 (11th Cir. 2010) ("We need not dwell on choice of law" questions "because we apply general rules of contract interpretation to discern the meaning of the contracts," and "would reach the same conclusions as to these issues regardless of what law we applied.").

As such, this is not a case in which application of state contract law would upset important federal interests or disturb some imperative uniformity in the federal common law.

Thus, given that courts "generally disfavor federal common law and apply it in only rare instances," *see Resnick*, 227 F.3d at 1350 n.4, the Court will follow the lead of the parties and apply Florida law to determine the enforceability of the settlement, while at times referencing the agreement of federal common law on the issues under consideration.  *See Eli Lilly & Co.*, 615 F.3d at 1314; *Twin City Fire Ins. Co. v. Colonial Life & Acc. Ins. Co.*, 375 F.3d 1097 (11th Cir. 2004) (declining to decide choice of law question where state laws were the same).

"To compel enforcement of a settlement agreement, its terms must be sufficiently specific and mutually agreed upon as to every essential element."  *Spiegel v. H. Allen Holmes, Inc.*, 834 So. 2d 295, 297 (Fla. 4th DCA 2003).  What matters is whether the parties have objectively agreed to all essential terms – "one party to a settlement is not required to be a mind reader or to know the private thoughts or intentions of the other party; rather, the parties need only agree on what they have actually said or expressed to each other."  *See In re Rolsafe Int'l*, 477 B.R. 884, 906 (Bankr. M.D. Fla. 2012); *see also United States v. Rand Motors*, 305 F.3d 770, 774 (7th Cir. 2002) (objective standard used to determine meaning of settlement agreement under federal common law).  "Uncertainty as to nonessential terms will not preclude enforcement, but terms not agreed to will not be enforced."  *Blunt*, 962 So. 2d at 988-89.  "The definition of 'essential term' varies widely according to the nature and complexity of each transaction and is evaluated on a case-by-case basis."  *Lanza v. Damian Carpentry, Inc.*, 6 So. 3d 674, 676 (Fla. 1st DCA 2009); *see also ABC Liquors, Inc. v. Centimark Corp.*, 967 So. 2d 1053 (Fla. 5th DCA 2007) (same).

Upon *de novo* review of the record here, the Court finds that the parties reached agreement on all essential terms at the mediation and memorialized them in the "Memo of Understanding."  As set forth therein, the Relator and MCCI agreed to "resolve their claims in this action against each other," with MCCI paying the Government "$1.6 million within 14 days of court approval of the dismissal" and "relator's counsel $300,000 in attorney fees and costs within 14 days of dismissal."  *See* Memo of Understanding [ECF No. 130-1].  MCCI also agreed "not [to] object to any relator share amount up to 30%."  *See id.*  And, finally, the Relator and MCCI agreed to "execute a settlement agreement that will include mutual releases, and a statement that there is no admission of liability and that the settlement is for economic reasons." *See id.*  The parties' meeting of the minds on these essential terms – payment of money in exchange for mutual releases, no admission of liability, and dismissal – was sufficient to form a

binding and enforceable agreement.  Moreover, the parties represented to the mediator, to each other, and to the Court that they had reached a full settlement.  *See* Notice of Settlement [ECF Nos. 108] (stating that "a full settlement has been reached between the Relator and MCCI").  These external manifestations of consent bound the parties, even though they still had to formerly execute mutual releases and obtain dismissal of the action.  *See Carpaneda v. Quayside Place Partners, LLP*, 2010 WL 2696958, at *2 (S.D. Fla. July 7, 2010) (Seitz, J.) (settlement agreement reached at mediation contained essential terms and was binding and enforceable; subsequent disputes over release language concerned "'mere contingencies' that were not essential to reaching the settlement drafted at mediation"); *Vital Pharms., Inc. v. S.A.N. Nutrition Corp.*, 2007 WL 1655421, at * (S.D. Fla. June 06, 2007) (Cohn, J.) (parties "intend[ed] to be bound by the terms that they negotiated and memorialized in a written settlement agreement, regardless of whether the formality of execution was carried out"); *see also McDonnell v. Engine Distribs.*, 2007 WL 2814628, at *8 (D.N.J. Sept. 24, 2007) ("The fact that [the parties'] proposed memorializations vary considerably with one another in no way disturbs the validity of that agreement. The disputed terms – concerning the scope of the release, ensuring payment, tax treatment, indemnification, and the scope of confidentiality – all speak to the settlement's implementation. They are not, however, essentials of the settlement.").

That the parties did not spell out every detail beyond the essential terms does not make the agreement illusory.  *See Blackhawk Heating & Plumbing Co., Inc. v. Data Lease Fin. Corp.*, 302 So.2d 404, 408 (Fla. 1974) ("Even though all the details are not definitely fixed, an agreement may be binding if the parties agree on the essential terms and seriously understand and intend the agreement to be binding on them."); *De Cespedes v. Bolando*, 711 So. 2d 216, 218 (Fla. 3d DCA 1998) ("Although there were certain issues not discussed and/or specifically agreed upon by the parties, we do not believe that these issues were essential to the enforceability of the agreement."); *Stempel v. Stempel*, 633 So. 2d 26, 26 (Fla. 4th DCA 1994) (while "agreement reached at mediation can be termed the 'barest' of bare bones agreements," it was nonetheless enforceable and "failure to agree to [additional, nonessential terms] does not vitiate the settlement agreement"); *Innkeepers Int'l, Inc. v. McCoy Motels, Ltd.*, 324 So. 2d 676, 678 (Fla. 4th DCA 1975) (contract enforceable even with the "presence of blanks" as to nonessential terms; "contract is not necessarily lacking in all effect because it expresses the idea that something is left to future agreement").

Nor is their agreement rendered infirm merely because they had to subsequently draw up mutual releases containing agreeable language. *See Sands v. Wagner & Hunt, P.A.*, 2009 WL 2730469, at *4 n.7 (S.D. Fla. Aug. 28, 2009) (Seltzer, J.) ("Defendants' suggestion that settlement was contingent upon the drafting of a release is unavailing; the release would have merely memorialized the essential terms to which the parties had previously agreed."); *Boyko v. Ilardi*, 613 So. 2d 103, 103 (Fla. 3d DCA 1993) ("execution of the settlement documents was not a condition precedent to the settlement agreement, but rather a mere procedural formality which both parties to the settlement agreement were obliged to perform"); *Dania Jai-Alai Palace, Inc. v. Sykes*, 495 So. 2d 859, 862 (Fla. 4th DCA 1986) (quibbles over release language did not invalidate settlement agreement).

MCCI's apparent opportunism following the motion to dismiss hearing did not negate the deal either. As noted above, a few days after the Court granted dismissal to the other Defendants, MCCI sent Relator a letter stating that it was "shocked to see [Relator's] assertions to the Judge" at oral argument – so shocked apparently that MCCI went on to declare, "[i]t is evident that we cannot agree on the proper language for a final settlement stipulation and all prior offers are withdrawn." *See* Mot. to Enforce [ECF No. 130-14]. By that time, however, withdrawal was not on the table. It was too late, the parties having already agreed on all material terms at the mediation. *See Lanza v. Damian Carpentry, Inc.*, 6 So.3d 674, 675 (Fla. 1st DCA 2009) (rejecting party's attempt to repudiate a binding settlement agreement by raising ancillary issues after settlement had taken place).

Further, the provisions insisted upon by the Government relating to unallowable costs and tax neutrality are not essential to the agreement ***between the Relator and MCCI***. The Government, while the real party in interest, is not a party to this lawsuit. *See U.S. ex rel. Eisenstein v. City of New York*, 556 U.S. 928, 933 (2009) (United States is only a "party" to FCA suit "if it intervenes in accordance with the procedures established by federal law"). It had its chance to intervene, but declined. Because the Government is not party to the lawsuit, it was also not made party to the settlement. So, any terms that it may insist upon as conditions precedent to dismissal do not effect whether the Relator and MCCI, as parties to the dispute, actually reached an agreement on all essential terms at mediation.

The Magistrate Judge concluded that "a binding settlement agreement between Relator and MCCI was not reached due to the failure to meet the condition precedent that the agreement

be approved by the Attorney General." *See* R&R at 9.  But that finding conflates two separate issues: (1) whether the parties agreed on all essential terms such that they had a binding agreement; with (2) whether the Government would consent to dismissal based on that agreement.  The statute says that the Government must consent to ***dismissal***, not that it must consent to the parties' settlement in order for a binding agreement to result.  *See* 31 U.S.C. § 3730(b)(1).  The two are not one and the same.  Even assuming, without deciding, that the Government has a right to approve or disapprove of voluntary dismissal, it does not follow that the Government's consent is required for a binding settlement to be formed.  This latter question – whether the parties reached agreement on all essential terms – is the key question before the Court at this time.  The Court recognizes that, in practical effect, there may be little difference between the Government's decision to torpedo a settlement and its decision to withhold consent to dismissal based on that settlement, but the threshold inquiry remains whether the parties to the agreement – here, the Relator and MCCI – reached an understanding on all essential terms.

Moreover, the unallowable costs and tax neutrality provisions amount to little more than boilerplate – they are not germane to the dispute being resolved.  Those provisions are merely there to insulate the Government from every conceivable contingency, no matter how improbable.  While including such language in settlements is standard practice, it is not essential to the parties' agreement in this case – nor, as far as the Court can tell, essential to protect the Government's interests here.  The Government has not explained how, absent the unallowable costs provision, MCCI would be permitted by the Government to charge back costs that are "unallowable" should MCCI someday secure a government contract.  Nor has the Government explained how, absent the tax neutrality provision, the Internal Revenue Service will be left with less authority and discretion to determine the appropriate tax treatment and consequences of MCCI's settlement payment.  The tax neutrality provision states that nothing in the agreement "constitutes an agreement by the United States concerning the characterization of the Settlement Amount for purposes of the Internal Revenue laws, Title 26 of the United States Code." *See* Draft Agreement ¶ 10 [ECF No. 130-7].  But the United States is not a party to the agreement at all, and so it could not possibly be deemed to have agreed, or disagreed, as to tax characterization of the settlement proceeds in any respect.  Rather, the agreement leaves the law as it stands.  *See Lanza*, 6 So. 3d at 676 (settlement agreements, like other contracts, "are made in legal contemplation of the existing applicable law.").

In short, the Court finds that the settlement between the Relator and MCCI is subject to enforcement.  The parties are therefore directed to finalize and execute their agreement, with the unallowable costs and tax neutrality provisions removed.  The parties shall present the executed agreement to the Government, which shall have an opportunity to consent to dismissal.  If the Government does consent, then the Court will grant dismissal.  Alternatively, if the Government declines to consent, the Court will proceed to address whether the Government's consent is necessary given that it declined to intervene.[1]

## Conclusion

Accordingly, it is hereby **ORDERED and ADJUDGED** that the Relator's Motion to Enforce Settlement [ECF No. 130] is **GRANTED IN PART**, as set forth above.  The Court **DECLINES TO ADOPT** the Magistrate Judge's Report and Recommendation [ECF No. 163]. MCCI's Renewed Motion to Dismiss [ECF No. 186] is **DENIED WITHOUT PREJUDICE**. Should the Government decline to consent to dismissal, and should this Court find that such consent is required, then MCCI may again seek to renew its Motion to Dismiss.

The Relator and MCCI shall complete and execute the final settlement documents forthwith, and forward them to the Government for review by **August 23, 2013**.  Then, by **September 23, 2013**, the Government shall inform the Court whether it consents to dismissal based upon the settlement.  If the Government requires more time, it shall file a notice setting forth the timeframe for its review and approval process by **September 23, 2013**, and the Court will consider whether to allow additional time.

**DONE** and **ORDERED** in chambers at Miami, Florida on August 2, 2013.

ROBERT N. SCOLA, JR.
UNITED STATES DISTRICT JUDGE

---

[1] It is axiomatic that courts should avoid thorny questions of law when possible.  *See, e.g.*, *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2080 (2011) ("Courts should think carefully before expending 'scarce judicial resources' to resolve difficult and novel questions of constitutional or statutory interpretation that will 'have no effect on the outcome of the case.'").  While, at present, the Court finds it unnecessary to reach the issue of whether the Government's consent to dismissal is required in a declined case, the Court has its doubts.  Upon initial review of the split of authority, the Court finds the approach taken by *United States ex rel. Killingsworth v. Northrop Corp.*, 25 F.3d 715 (9th Cir. 1994), and *United States ex rel. Fender v. Tenet Healthcare Corp.*, 105 F. Supp. 2d 1228 (N.D. Ala. 2000), to be most consistent with the statutory scheme as a whole.